UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CRIMINAL NO. 3:17CR9(JAM) |
| v. | : | |
| | : | |
| COREY BRINSON | : | April 7, 2017 |

### Memorandum in Aid of Sentencing

For nearly six years, the defendant, Corey Brinson, abused his position as an attorney to facilitate a multimillion-dollar investor fraud scheme. On January 20, 2017, he pleaded guilty to a one-count information charging him with money laundering, in violation of 18 U.S.C. § 1957. He now is seeking a sentence of one year and a day of imprisonment. But such a sentence is wholly inadequate to reflect the seriousness of the offense, the multiyear nature of Mr. Brinson's involvement, his flagrant misuse of his attorney trust account to facilitate the crime, and the high degree of victim impact. At the same time, these aggravating factors are offset somewhat by the defendant's military service and record of community involvement. Moreover, since learning of this investigation, Mr. Brinson has taken the right steps to demonstrate acceptance of responsibility. As such, the government respectfully suggests that a sentence that includes a significant term of imprisonment, but still falls below the applicable Sentencing Guidelines range of 51 to 63 months, is appropriate here.

1

## I.   Factual Background

The facts underlying Mr. Brinson's conviction are set out accurately in the presentence report, and adopted by the government with certain supplementary details and supporting exhibits as follows.

From roughly October 2010 until July 2016, the defendant lent his name, law practice, and attorney trust account to a client, Christian Meissenn, who was running an investor fraud scheme out of Mr. Brinson's law office in downtown Hartford. The scheme (commonly known as a "pump and dump") involved the fraudulent promotion and sale of worthless securities issued by a series of shell corporations controlled by Mr. Meissenn's co-conspirators. The defendant knew that Mr. Meissenn was barred from the securities industry and, accordingly, used an alias (Robert Denton) when speaking with investors, including in the defendant's presence on at least one occasion.

In a typical transaction, one of Mr. Meissenn's co-conspirators would acquire a dormant public company with no history of litigation or other obvious red flags that might deter prospective investors. The co-conspirator then would issue a controlling block of corporate stock to himself or a related party, and gift or sell at bargain-basement prices huge blocks to other insiders. At that point, the insiders artificially would inflate the value of the stock by paying salesmen to solicit investors, issuing press releases, and otherwise circulating false and misleading statements about the stock's projected performance and the financial health and prospects of the issuing company. The hype would cause new, unwary investors to purchase the stock and

2

thus lead to higher share prices. The insiders then would sell off their own shares at a significant profit before allowing the stock to plummet.

Mr. Brinson played a limited but crucial role in the scheme. On the front end, he served in a nominal capacity as "securities counsel" to the issuing companies, and he was listed as such in the companies' public filings. Because Mr. Brinson apparently had no knowledge of securities law, his position entailed no real work. At the scheme's outset, Mr. Brinson was supposed to draft different types of attorney opinion letters to accompany stock transactions. The first type of letter was intended to provide assurances to securities markets and prospective investors that Mr. Brinson, as an attorney, had adequately reviewed the relevant corporate records and filings and was satisfied with the adequacy of the issuing company's public disclosures. (Exhibit 1) The second type of opinion letter was used to remove the restrictive legend that appears on the certificates of certain classes of securities that fall within the definition of "restricted securities" under the Securities Act of 1933, 15 U.S.C. §§ 77a *et seq.* (Exhibits 2, 3) Restricted securities are securities acquired in unregistered, private sales from the issuing company or from an affiliate of the issuer. Under Rule 144 of the Securities Act of 1933, a holder of restricted securities (often a corporate insider) cannot sell the restricted securities to the public until the restrictive legend has been removed from the certificate, which only can be accomplished by a transfer agent, *i.e.*, an individual or company that is assigned by a corporation to, among other things, maintain records of investors and transactions, and cancel and issue stock certificates. However, a transfer agent will not remove the restrictive legend without

the issuer's consent, which usually is given in the form of an opinion letter from the issuer's counsel (here, Mr. Brinson) after reviewing the relevant documentation. The opinion letter must state why it is proper for the restrictive legend to be removed. Without the opinion letter, the transfer agent lacks authority to remove the legend and permit execution of the trade in the marketplace.

Both types of opinion letters were integral to the scheme's success. But the defendant never performed any of the due diligence described in the letters. In fact, after a few failed drafting attempts early on, Mr. Brinson neither wrote nor even reviewed the letters before they went out. On August 24, 2011, for example, the defendant emailed a draft opinion letter to one of Mr. Meissenn's associates (a non-lawyer). (Exhibit 4) After reviewing Mr. Brinson's draft, the associate responded: "it[']s totally wrong – send me the word file so that i can change it." *Id.* Mr. Meissenn's associate then rewrote the defendant's letter and sent it back to Mr. Brinson: "here it is – do i have your permission to file?" (Exhibit 5) Two minutes later, Mr. Brinson, who was traveling to Martha's Vineyard and emailing from a BlackBerry, responded: "Yes do you need my signature[?]" *Id.* The associate replied: "no i copied and pasted it from the pdf." *Id.* By mid-2012 and throughout 2013, Mr. Meissenn's associate regularly was writing and signing "opinion" letters on Mr. Brinson's behalf, with Mr. Brinson receiving copies only *after* the letters were filed. (Exhibits 6, 7, 8, 9) Mr. Brinson participated in this improper arrangement for two years, until April 2014, before he directed the scheme's other participants not to issue any more "opinion" letters in his name. (Exhibit 10)

Mr. Brinson's front-end role also included miscellaneous securities-related tasks. For instance, in 2012, he compiled a list of investors who had not yet received stock certificates. (Exhibit 11) He also fielded telephone calls and emails from investors who had not received their certificates or share purchase agreement forms. (Exhibit 12) Although some of these investors called repeatedly, Mr. Brinson merely passed along their complaints to his confederates. (Exhibits 13, 14) Finally, on at least one occasion, Mr. Brinson agreed to help forge the signatures of certain investors in order to facilitate an insider transaction. (Exhibit 15)

On the back end, Mr. Brinson laundered a portion of the scheme's proceeds through his Interest on Lawyer Trust Account ("IOLTA"). The securities involved in the scheme were sold in two ways. The vast majority of transactions were investor-to-investor sales on the open market; these sales never touched Mr. Brinson's IOLTA, and he likely knew nothing about them. But there also were a number of "private placement" sales directly from the issuing companies to investors who had been solicited by salesmen who were paid to promote the securities. In these transactions, investors sent their purchase money to the trust accounts of various attorneys connected to the scheme, including Mr. Brinson.

In all, the defendant laundered more than $3 million in investor funds through his IOLTA. Although unsuspecting investors frequently sent the defendant money earmarked for the purchase of stock, virtually none of that money went to the issuing companies. Instead, Mr. Meissenn and others directed the defendant to distribute nearly all the money to relatives, associates, and shell companies associated with, or

under the control of, Mr. Meissenn and his co-conspirators. For example, the defendant sent $189,500 in investor funds from his IOLTA to pay for Mr. Meissenn's home renovations. The defendant also withdrew, in a series of over 200 transactions, a total of approximately $519,600 in cash for Mr. Meissenn.[1]  The defendant's money laundering activities also included his transfer of hundreds of thousands of dollars from his IOLTA to shell entities under Mr. Meissenn's control—including about $22,000 to a company that he and Mr. Meissenn co-owned.

In exchange for providing the appearance of legitimacy that helped perpetuate this long-running scheme, and engaging in textbook money laundering, the defendant received about five percent of the investor funds that passed through his IOLTA.[2]  In addition, Mr. Brinson received about $500 for each of the opinion letters described above, even if he did nothing more than allow someone else to write the "opinion" expressed in the letter and affix his signature. In all, Mr. Brinson made approximately $200,000 from his involvement in the scheme.

---

[1] An IOLTA exists to serve the limited purpose of holding client or third-party funds. Cash withdrawals from an IOLTA, therefore, are highly irregular. Indeed, Connecticut Rule of Professional Conduct 1.15(k)(3) provides that withdrawals from an IOLTA "shall be made only by check payable to a named payee or by authorized electronic transfer and not to cash." The defendant's cash withdrawals from his IOLTA never exceeded the $10,000.01 threshold for a bank to file a Currency Transaction Report ("CTR") codified in 31 C.F.R. § 1010.311. Indeed, Mr. Brinson appears to have structured certain transactions in amounts less than $10,000.01 so as to avoid the CTR filing requirement. For example, on December 14, 2015, Mr. Brinson made a cash withdrawal of $1,200 from his IOLTA. Two days later, he withdrew $5,000 in cash from the IOLTA. The next day, December 17, 2015, Mr. Brinson made another cash withdrawal of $4,000 from the IOLTA. Put another way, Mr. Brinson withdrew $10,200 in cash (likely on Mr. Meissenn's behalf) from his IOLTA over three days, which would have triggered the filing of a CTR had the withdrawals occurred on the same day.

[2] These payments also included legal fees for various legal services unrelated to the scheme that the defendant provided to Mr. Meissenn.

## II.     Sentencing Guidelines

The government agrees with the Sentencing Guidelines calculation in the presentence report. The total amount of investor funds that the defendant knowingly laundered through his IOLTA was $3,049,027.06, which results in a base offense level of 24 under U.S.S.G. § 2S1.1(a)(2). One level is added because the offense of conviction is 18 U.S.C. § 1957. U.S.S.G. § 2S1.1(b)(2)(A). Two levels are added under U.S.S.G. § 3B1.3 because the offense involved abuse of a position of trust and/or use of a special skill. Three levels are subtracted under U.S.S.G. § 3E1.1 for acceptance of responsibility, resulting in a total offense level of 24. Because the defendant falls within Criminal History Category I, his advisory Guidelines range is 51 to 63 months of imprisonment.

## III.    Discussion

This is a sad case, in part for the reasons detailed in the defendant's sentencing memorandum. Mr. Brinson has squandered years of hard work and has absolutely dishonored his legal career. But the real victims here are the dozens of unsuspecting investors who lost money to Mr. Brinson and his confederates.[3]  Several of these victims will address the Court at Mr. Brinson's sentencing hearing and explain why

---

[3] There were 49 identifiable investors who bought securities in "private placement" transactions and whose purchase money was laundered through the defendant's trust account. This figure does not include the thousands of victims who bought securities on the open market and lost money as a result of this scheme. The government is still in the process of calculating these open-market losses. But the government is not aware of any evidence suggesting Mr. Brinson had any knowledge of the open-market trading.

the involvement of a prominent attorney made them more willing to part with their money.

By any measure, Mr. Brinson's crime was serious. He participated in the scheme for nearly six years, or roughly half his legal career. In that time, he laundered more than $3 million in funds stolen from investors. He did so by flagrantly misusing the tools and trappings of his trade—his standing as an attorney, his trust account, his opinion letters, and his Hartford law office where he leased space to Mr. Meissenn. And for abusing his professional skills and responsibilities, Mr. Brinson netted $200,000 of other people's money.

The most serious aspect of this crime is the effect on investors. As reflected in the victim impact statements submitted to the Court, some investors lost their retirement savings. A 72-year-old retiree was forced to return to work driving a school bus. Other victims lost their grandchildren's college funds. An 84-year-old victim was planning to use the money he lost to pay for an assisted living facility. These are the devastating consequences of the defendant's crime and the crimes of those he helped.

The government acknowledges that Mr. Brinson is not the most culpable member of this scheme. Although $200,000 is a lot of money, the defendant earned less money than others. While he lent his good name and title as an accomplished attorney to the scheme, the defendant did not play a leadership role. And although the defendant allowed others to concoct fraudulent "opinion" letters in his name, he did not directly pitch stocks to investors. These are all factors that appropriately do not increase Mr. Brinson's total offense level under the Sentencing Guidelines.

But the defendant goes too far when he says he was unaware that investors were being defrauded. *See* Def. Sen. Mem. at 16. If he did not have actual knowledge that the securities being sold to investors were worthless, it is only because he deliberately ignored obvious warning signs. The facts speak for themselves:

- The defendant knew he was helping Mr. Meissenn, who worked out of his law office, to hide assets from creditors (and presumably tax collectors).[4]

- The defendant knew Mr. Meissenn was involved in the sale of securities despite being barred from the industry.

- The defendant knew he was helping to conceal Mr. Meissenn's involvement from securities regulators.

- The defendant knew that, having been barred from the securities industry, Mr. Meissenn used an alias when communicating with investors.

- The defendant knew that Mr. Meissenn was paying to use his IOLTA as a pass-through for the proceeds of securities sales.

- The defendant knew that investors sent in money for the purchase of corporate stock, but virtually none of that money ever went to the issuing companies.

- The defendant knew that some investors—even some who complained to him repeatedly—were not receiving their share certificates. (Exhibits 13, 14)

- The defendant knew that, at least once, he was asked to forge investor signatures. (Exhibit 15)

- The defendant knew he was not performing any of the due diligence described in the many opinion letters bearing his name and signature.

---

[4] As the Court is aware, Mr. Meissenn has pleaded guilty in a related case to conspiracy to commit mail and wire fraud, in violation of 18 U.S.C. § 1349, and tax evasion, in violation of 26 U.S.C. § 7201. *See* 3:16CR201(JAM). In Mr. Meissenn's plea agreement, he agreed that he willfully failed to report income of $4,398,155.80 and thus evaded $1,527,834 in income taxes.

9

Along these lines, Mr. Brinson's decision in April 2014 to stop permitting his name to be used on opinion letters is unavailing. (Exhibit 10) While his decision may have been prompted by a recognition that flesh-and-blood investors, as opposed to "just" transfer agents and other market gatekeepers, were relying on the letters, *see* Def. Sen. Mem. at 8, he overlooks that these very gatekeepers exist to protect investors. And most tellingly, after realizing that investors were being misled by his letters, the defendant continued as the scheme's banker for two more years. Against this backdrop, it is not credible for the defendant to assert that he did not understand investors were being harmed.

Mr. Brinson describes himself as "guileless," Def. Sen. Mem. at 6, but he is no naïf. He graduated from the University of Connecticut School of Law, worked as an associate for several years at well-regarded law firms in Hartford and Washington, D.C., ran a state-wide campaign for Connecticut Secretary of State, and served on the Hartford City Council. He may not have been a securities lawyer, but he had the education, experience, training, military service, upbringing, and common sense to know right from wrong. He knew his actions clearly crossed the line, but he was attracted by the promise of easy money. He wanted what Mr. Meissenn appeared to have—fancy cars, a large house. So he asked no questions and did whatever he was told so long as he got his five-percent fee.

Similarly, funneling fraud proceeds through an IOLTA is not indicative of a lack of sophistication, as the defendant asserts. *See* Def. Sen. Mem. at 17-18. To the contrary, misusing one's IOLTA is a fundamental indicator of calculated wrongdoing.

Like a shell company, the IOLTA provided a layer of concealment from regulators and law enforcement that, in this case, allowed the scheme to operate undetected for almost six years.

The government also disagrees with the defendant's characterization of his offense as an "aberration." Def. Sen. Mem. at 14. While the defendant should be credited for the good he has done in his life, his lengthy involvement in this crime cannot be dismissed as a momentary lapse in judgment. The defendant's wrongdoing was a daily, sustained course of misconduct that spanned nearly six years and involved hundreds of separate transactions. The defendant was enmeshed in this scheme for one-third of his adult life and fully half his career as a lawyer. If character is defined by what we do every day, it is difficult to view this crime as aberrational.

The offense conduct in this case is not the only instance in which the defendant has displayed stunningly bad judgment that reveals a lack of respect for the rule of law. Most notably, in 2013, he appeared in a YouTube video created by "Team Grease," a violent Hartford-area street gang. (Exhibit 16)[5] In the video, shortly after an "informant" is shown on screen, Mr. Brinson is depicted in his law office holding a large stack of money like a telephone, and turning over documents confirming the person is an informant to one of the gang's members. The rest of the video portrays the gang's efforts to retaliate against the government witness. In short, the video is an "anti-snitching" warning that witnesses should not come forward to assist law

---

[5] A copy of the video is being hand-delivered to the Court. The video is also available online at https://www.youtube.com/watch?v=1vmjewHRuAg.

enforcement. For all that Mr. Brinson has served as a positive role model in his community over the years, *see* Def. Sen. Mem. at 20, this was a jarring instance of him modeling extremely poor—not to mention dangerous—behavior.

All that said, there are important sentencing factors that cut in Mr. Brinson's favor, including his military service and history of civic engagement. The many glowing personal letters Mr. Brinson has provided to the Court are a testament to his efforts over the years to help others. Moreover, since learning of this investigation, he has taken all the right steps. He admitted his misconduct from the outset, and did not falter in his commitment to accepting responsibility even after the initial plea agreement fell through and the terms of the deal worsened for him. Also to his credit, Mr. Brinson has voluntarily surrendered his law license and set aside money for restitution.

These factors support a sentence below the applicable Guidelines range of 51 to 63 months of imprisonment. The parties' plea agreement recognizes that, if the Guidelines were based on the defendant's gain instead of the total amount of laundered funds flowing through his IOLTA, the resulting range would be 27 to 33 months of imprisonment. A sentence just above that range would reflect that gain is an imperfect proxy for culpability here because the defendant's abdication of his ethical duties as a lawyer was so egregious and the resulting victim impact is so high. Moreover, such a sentence would fall just between the mean sentences for money

laundering in the Second Circuit (29 months) and nationally (38 months). *See* Def. Sen. Mem., Tab K at 10.[6]

The sentence the defendant is seeking—a year and a day in prison—is too low to reflect the seriousness of his offense and to promote general deterrence and respect for the law. Real people lost a lot of money in this scheme. In part because the defendant was an attorney—and one whose website touted his military service, professional accomplishments, and involvement in local government—investors trusted that their money was in good hands. These victims could not have known that the defendant was keeping five percent of their money and passing along the rest to Mr. Meissenn's co-conspirators, that he was not doing any of the due diligence detailed in his opinion letters, or that he was helping to conceal the involvement of someone (Mr. Meissenn) who was barred from securities sales. The need to strongly condemn this conduct and to deter other professionals from crossing similar lines calls for a meaningful punishment that will not be perceived merely as a "cost of doing business." Likewise, the public must see that lawyers who misuse their licenses in a manner that harms others are prosecuted and punished accordingly.

Mr. Brinson should not be spared significant prison time due to the collateral consequences of his conviction. As he concedes, these are of his own device. *See* Def. Sen. Mem. at 21. "[T]he social stigma of being a convicted felon" is a "normal incident" of committing a felony offense. *United States v. Repking*, 467 F.3d 1091, 1096 (7th

---

[6] These statistics, which are attached to the defendant's sentencing memorandum, were compiled by the Sentencing Commission and reflect sentences imposed in 2015.

Cir. 2006); *see also United States v. Bistline*, 665 F.3d 758, 765 (6th Cir. 2012). To treat Mr. Brinson's loss of stature or prospective inability to practice his chosen profession as grounds for leniency is to risk treating white collar defendants less harshly than "street" criminals, who often do not have these things to lose.

In sum, the government is seeking a sentence that includes a significant term of imprisonment, a period of supervised release, and restitution to the defendant's victims. As to restitution, the parties' plea agreement contemplates the defendant's payment of restitution in the full amount of the laundered funds attributable to him, *i.e.*, $3,049,027.06, subject to his right to argue for apportionment under 18 U.S.C. § 3664(h). Despite diligent efforts to identify the relevant universe of victims, however, the government has been unable to do so completely. More specifically, about half of the investor funds coming into the defendant's IOLTA first passed through other bank or brokerage accounts held by various shell companies or nominees. The commingling of funds in these other accounts makes it impossible to identify specifically the investors whose money ultimately flowed through the defendant's IOLTA. Hence, the government is seeking restitution on behalf of 49 identifiable victims in the total amount of $1,417,810.[7]

The government believes that apportionment is inappropriate here for several reasons. First, the final restitution amount ($1,417,810) already is significantly lower than the agreed-upon amount in the plea agreement ($3,049,027.06). Second, the

---

[7] A list of the victims to whom restitution is owed is being filed concurrently under seal, because the list identifies the victims' names and home addresses.

defendant directly participated in the scheme by, among other things, acquiescing to the issuance of fraudulent opinion letters in his name. Third, as described above, the defendant deliberately ignored other obvious warning signs that investors were being defrauded. Fourth, because the defendant had sole access to his IOLTA records and understood that his gain ($200,000) represented only five percent of the investor funds flowing through the IOLTA, he was fully aware of the scheme's scope. Finally, while Mr. Brinson's restitution obligation is limited only to the "private placement" transactions that flowed through his IOLTA, Mr. Meissenn (and anyone else who may be charged in the future) may also be on the hook for open market trading losses; hence, whatever restitution payments Mr. Meissenn ultimately makes will be spread across a far larger pool of victims. As a result, obliging Mr. Brinson to pay the full amount of $1,417,810 is necessary to increase the odds that the 49 identifiable victims whose losses were foreseeable to him will be made whole.

Respectfully submitted,

DEIRDRE M. DALY
UNITED STATES ATTORNEY

/s/ Avi M. Perry
AVI M. PERRY
PETER S. JONGBLOED
ASSISTANT U.S. ATTORNEYS

United States Attorney's Office
157 Church Street, 25th Floor
New Haven, CT 06510
avi.m.perry@usdoj.gov
203-821-3700
Federal Bar No. phv07156

15

## **CERTIFICATE OF SERVICE**

I hereby certify that on April 7, 2017, a copy of the foregoing Memorandum in Aid of Sentencing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

/s/ Avi M. Perry
AVI M. PERRY
ASSISTANT UNITED STATES ATTORNEY