UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - x
                                :
UNITED STATES OF AMERICA        :   No. 3:17CR9(JAM)
                                :
          vs.                   :
                                :
COREY BRINSON,                  :
                                :   New Haven, Connecticut
                  Defendant     :   April 13, 2017
                                :
- - - - - - - - - - - - - - - - x


SENTENCING


     BEFORE:

        THE HONORABLE JEFFREY ALKER MEYER, U.S.D.J.



APPEARANCES:


     FOR THE GOVERNMENT:

          OFFICE OF THE UNITED STATES ATTORNEY
               157 Church Street, 23rd Floor
               New Haven, Connecticut 06510
          BY:  AVI PERRY, AUSA
               PETER S. JONGBLOED, AUSA

     FOR THE DEFENDANT:

          COWDERY & MURPHY, LLC
               280 Trumbull Street, 22nd Floor
               Hartford, Connecticut 06103
          BY:  THOMAS J. MURPHY, ESQ.


                         Diana Huntington, RDR, CRR
                         Official Court Reporter

1                          **10:07 A.M.**

2              THE COURT:  We are here today for purposes of

3    sentencing in the matter of United States of America vs.

4    Corey Brinson.

5              May I have the appearance of counsel, please,

6    for the government?

7              MR. PERRY:  Good morning, Your Honor.  Avi Perry

8    for the United States.  With me at counsel table is

9    Assistant U.S. Attorney Peter Jongbloed, Special Agent

10   Maria Papageorgiou from the IRS, Special Agent Patrick

11   Daly from the FBI.

12             And I will note, Your Honor, there are a number

13   of victims present today.

14             THE COURT:  Thank you.

15             Mr. Murphy.

16             MR. MURPHY:  Good morning, Your Honor.  Thomas

17   Murphy on behalf of Mr. Brinson who is here at counsel

18   table with me.  And there are a group of family members

19   and friends and former professional colleagues of

20   Mr. Brinson present.

21             THE COURT:  Mr. Brinson, are you doing okay

22   today, considering why we're here?

23             THE DEFENDANT:  Yes, Your Honor.  It's been nine

24   months.  Thank you.

25             THE COURT:  Thank you.  Please be seated.

1          On January 20, 2017, Mr. Brinson did appear

2     before me for the purposes of entering a plea of guilty to

3     a count of money laundering in violation of 18 U.S.C.

4     Section 1957.

5          A presentence report has been prepared by our

6     probation officer, Meghan Nagy.  Thank you, Ms. Nagy, for

7     your work on this intricate case.

8          Mr. Brinson, I just want to review with you a

9     little bit about what it is I intend to cover during

10    today's proceedings.

11         The first thing I'm going to do is I'm going to

12    go through some fairly technical matters.  I'm going to go

13    back and forth with counsel to make sure I've reviewed and

14    received what I should have received and reviewed for

15    purposes of today's sentencing.

16         After I'm done with that, and also talk about

17    whether there's going to be a dispute about how the

18    Sentencing Guidelines which of course are advisory apply

19    in this case, I'll turn it over to Mr. Perry for purposes

20    of hearing from any victims that would like to speak.

21    I've obviously received a number of the victim

22    communications here.

23         After I'm done with that, I'll turn it back to

24    you, Mr. Murphy, to make a presentation on Mr. Brinson's

25    behalf.

1              Mr. Brinson, you'll be permitted at that time to

2    make a statement if you'd like.  I've obviously received

3    and read your letter and received and read the letters of

4    the many supporters, but you'd be welcome to make any

5    statement you would like.  If you have supporters who

6    would like to speak on your behalf, they'd be welcome to

7    do so as well.

8              After I hear from you, Mr. Brinson, I'll hear

9    from the government with any additional thoughts the

10   government may have here.

11             And then after hearing from the government, I'll

12   hear from Mr. Murphy one more time if there's anything

13   that you'd like to say in response to the government's

14   presentation.

15             At that point I'm going to take a break to try

16   to consider all that I've heard and then return, I hope,

17   to impose sentence.

18             Is that clear?

19             THE DEFENDANT:  Thank you, Your Honor.

20             THE COURT:  So in terms of what I've reviewed,

21   I've reviewed everything that's been filed on the docket

22   in this case.  That's principally the presentence report

23   as well as the parties' sentencing memoranda and the many

24   victim letters that have been received as well as the many

25   letters and supplements to letters that Mr. Murphy has

1    submitted from friends and family and other former

2    professional colleagues.

3            Does anybody think there's anything else I

4    should have reviewed or may have overlooked?

5            MR. PERRY:  Not to my knowledge, Your Honor.

6            THE COURT:  No last-minute letters that have

7    come in in the last day?

8            MR. MURPHY:  Nothing further from us,

9    Your Honor.

10           MR. PERRY:  One of the victims who intends to

11   speak today handed me a letter from his daughter this

12   morning, which I believe he intends to hand to Your Honor.

13   I provided a copy to Attorney Murphy.  I can hand it up

14   now if you'd like.

15           THE COURT:  Does the victim intend to read that

16   letter?

17           MR. PERRY:  My understanding is I believe he

18   intends to hand it up to Your Honor.

19           THE COURT:  Whatever is comfortable for you,

20   sir, would be fine.  Maybe we'll wait until that point in

21   time and I'll be happy to review that then.

22           So Mr. Brinson, have you read the presentence

23   report?

24           THE DEFENDANT:  I have, Your Honor.

25           THE COURT:  Have you had an opportunity to

1    discuss it with Mr. Murphy?

2              THE DEFENDANT:  I did.

3              THE COURT:  And with respect to the presentence

4    report's factual statements, are there any remaining

5    disputes about the factual statements that are set forth

6    in the presentence report?

7              THE DEFENDANT:  No, Your Honor.

8              MR. MURPHY:  Not from our perspective.

9              MR. PERRY:  Nor from the government.

10             THE COURT:  The presentence report calculates a

11   final offense level of 24 and a criminal history category

12   I.  That would correspond to a recommended range of

13   imprisonment of something between 51 to 63 months of

14   imprisonment; that would be followed by a term of

15   recommended supervised release between one to three years;

16   a criminal fine recommendation between 20,000 to $200,000;

17   a recommended restitution amount -- we'll have lots of

18   questions about that -- of $3,049,027.06, I believe that

19   tracks with the parties' plea agreement; and a $100

20   special assessment.  I think that's all in accordance with

21   the parties' plea agreement and set forth in the

22   presentence report.

23             Will there be any objections to the presentence

24   report's calculation of the guidelines, of course without

25   prejudice to the parties' right to argue for departure or

1    variance?

2            MR. PERRY:  No objection from the government.

3            MR. MURPHY:  Nor from us, Your Honor.

4            THE COURT:  I will therefore adopt the

5    presentence report's factual statements and the

6    presentence report's guidelines calculations.

7            So that's it for the technical matters I needed

8    to review.

9            Mr. Perry, I think at this point if the

10   government would like to assist any victims who might want

11   to make statements.

12           MR. PERRY:  Thank you, Your Honor.

13           I think Your Honor should have received

14   approximately 17 impact statements.  I received phone

15   calls from a number of other victims who wanted to speak

16   with me over the phone who essentially relayed similar

17   comments to those that Your Honor would have seen in the

18   victim impact statements.  We have six gentlemen here

19   today who would like to address the Court.

20           First I'll call Thomas Byerly.

21           THE COURT:  Come on up to the lectern, sir.  And

22   if you can just start by saying and spelling your name for

23   our court reporter.

24           MR. BYERLY:  Spelling my name?  T-O-M.  Last

25   name is Byerly, B-Y-E-R-L-Y.

1          THE COURT:  Okay, great.  Please proceed.

2          MR. BYERLY:  I'll just start with a couple of

3    things that happened before this all occurred.

4          I was widowed a few years before 2015 and also

5    retired.  And after all the expenses of my wife's thing, I

6    was left with an insurance policy of $25,000.  And I

7    promised myself at that time and since then to use that

8    money and hopefully grow it to do some things that we both

9    cared about which was contributing, helping with our

10   bodies and our money to poor kids in poor schools

11   regardless of where it was.  And I've since planned on

12   doing just that.  And that money, of course, has all

13   disappeared, but I'm still trying to do what I can with

14   that.

15         The other part of it besides, you know, the

16   financial, it personally has affected me by many sleepless

17   nights and kind of beating myself up, how could I be so

18   gullible, so stupid, after living 77 years plus and, you

19   know, doing something quite this stupid.

20         The one thing that really kind of convinced me

21   to make the checks out on the two checks that I wrote to

22   the Brinson office was that it was a contract.  He was a

23   lawyer.  It looked like it was legitimate.  I wouldn't

24   have done that with just that call from the guy on the

25   phone which was Mr. Newman at the time.  When this

1    happened, I thought, okay, this looks good.

2              THE COURT:  So you were told by Mr. Newman to

3    send your payment to Mr. Brinson?

4              MR. BYERLY:  Yeah, right, yeah.  And then he

5    forwarded me the contracts, the first one and then the

6    second one which was supposed to be just added to it.

7    That's what I was told.

8              THE COURT:  Mr. Brinson did that?

9              MR. BYERLY:  No, no.  Mr. Newman.  But he said

10   make the checks out, which I did, two checks to

11   Mr. Brinson --

12             THE COURT:  Okay.

13             MR. BYERLY:  -- and mail those in right away.

14             The thing that didn't get me too excited was he

15   said, oh, it has to be there right away, it has to be

16   there right now.  So special delivery and all that to get

17   those.  That should have been another red flag.  Take it

18   or leave it right now or the deal doesn't exist.  So I

19   felt a little bit of pressure and that was disconcerting,

20   but I overcame it.

21             And then sometime in the middle of 2015, I don't

22   know when it was, when this stuff just wasn't coming, I

23   decided this is -- I lost it.  So many sleepless nights

24   and kind of kicking myself around.  And that's basically

25   it.

1         It was just -- and again, I'm still doing some

2    things where I want to help some people out.  I had a trip

3    last fall to Nepal on a friendship exchange to go visit,

4    and that just broke my heart.  I wanted to do a lot more

5    and I still plan on doing so if I can get anything out of

6    this.

7         THE COURT:  Certainly.  And sir, did you have

8    any other dealings at all with Mr. Brinson?

9         MR. BYERLY:  No, no.  There was another stock

10   too, but I guess that's a different matter.  Mostly -- it

11   was only CBBB, Continental Beverage, with Mr. Brinson's

12   office.

13        Oh, I also -- he just said that I did offer that

14   I tried to call Mr. Brinson's office.  And to my

15   knowledge, I never really spoke -- I heard voices in that

16   office, which I don't know, but one time I thought -- I

17   knew it was Mr. Newman's voice.  But nobody ever really --

18   never really talked to me.  He'll call you back or there

19   was just no answer.

20        THE COURT:  So you called Mr. Brinson's office?

21        MR. BYERLY:  Yeah.

22        THE COURT:  You heard voices, you say?

23        MR. BYERLY:  Yeah, I just heard voices in the

24   background after somebody picked up and said hello and I

25   asked to speak with him.

1         THE COURT:  And you were asking to speak with

2    Attorney Brinson?

3         MR. BYERLY:  Yeah, yeah.  But I never got any

4    response.

5         THE COURT:  Okay.  All right.  Anything else you

6    want me to know, sir?

7         MR. BYERLY:  I guess that's about it.

8         THE COURT:  Thank you for coming in.

9         MR. BYERLY:  Thank you.

10         MR. PERRY:  Your Honor, Michael Kinard,

11    K-I-N-A-R-D.

12         MR. KINARD:  Hi, I'm Michael Kinard from

13    Meridian, Mississippi.  M-I-C-H-A-E-L, K-I-N-A-R-D.

14         THE COURT:  Welcome, sir.

15         MR. KINARD:  And I was presented this stock

16    from, well, CBBB, again, from Brian Ferraioli.  But I was

17    instructed to send money to Mr. Corey Brinson.  Mr. Corey

18    Brinson's office sent me an e-mail with the wiring

19    instructions and the documents to mail out, his assistant

20    sent it to me.

21         Later on I made a phone call to Mr. Corey

22    Brinson's office.  And after a couple of times I was

23    finally able to speak with him directly.  I spoke with

24    Mr. Brinson about the stock transfer and where it stood,

25    because I hadn't received anything.  I'd sent his office

1    over $200,000, wire transfers, different amounts at

2    different times.

3        Anyway, I called his office and asked where the

4    stock transfer was.  He told me to contact the person that

5    I had been dealing with and not to contact him.  And I

6    said, "Well, I sent you the money, to your escrow

7    account."

8        The reason I invested, I did my due diligence, I

9    looked up Mr. Brinson and saw that he was a respected

10   member of the community and ran for office.  And I thought

11   it was a legitimate stock based on that.  I mean, there

12   was an attorney involved.  He is a representative of the

13   Court.  He's an officer of the Court.  So with that in

14   mind, I thought this was a legit, above-board investment.

15   So I sent the money that I'd earned over the years to

16   invest, to grow my retirement for my future, for my kids.

17       I have four children at home.  I have one fixing

18   to go to college.  Well, I'm not going to be able to send

19   him to college now without getting student loans and stuff

20   like that that will create more debt down the road.  I

21   have a 15-year-old that will soon be going to college

22   which I will probably have to do the same thing unless we

23   get some restitution back in a short order, which I don't

24   believe that will take place for many years, if not any.

25       I guess the mental impact to me and my family,

1   it's hard to put the totality of the emotions into words,

2   but basically I feel like a fool's fool.  I've given away

3   my family's future to this man and other people apparently

4   involved, but I sent the money directly to him.  I hold

5   him responsible.  He is a member of the Court or was a

6   member of the Court at the time these transactions were

7   taking place.

8           I don't know.  Do you have any questions, sir?

9           THE COURT:  How is it that you first learned

10   about the investment opportunity?

11           MR. KINARD:  Brian Ferraioli called me.

12           THE COURT:  All right.

13           MR. KINARD:  And then he put me in contact with

14   Mr. Brinson's office.

15           THE COURT:  For sending the money?

16           MR. KINARD:  For sending the money.

17           THE COURT:  What's your area of work?

18           MR. KINARD:  I'm a member of the International

19   Guard, a branch of the Air Force.  I am also -- I just

20   recently became involved in insurance, I'm an insurance

21   agent for Allstate.  So I'm in a position in trust as he

22   was.  So that's -- I just don't understand how somebody

23   could just knowingly take this money and do whatever they

24   felt like.  To me it was stolen from me.  I might as well

25   have just handed it to a stranger or took it outside and

 1    lit it on fire because it was taken from my family.

 2              THE COURT:  Anything else you want me to know,

 3    sir?

 4              MR. KINARD:  It's hard to put -- I mean, the

 5    financial impact to my family will be through my lifetime

 6    into my children because I cannot pass that money on to my

 7    children later on in life because it's gone.  I guess

 8    that's all I have to say.

 9              THE COURT:  Thank you.  And thank you for

10    traveling to court today.

11              MR. KINARD:  Yes, sir.  I do appreciate the

12    court system allowing us to come and do this.  It does

13    help a little.

14              THE COURT:  It's very important.  Thank you,

15    sir.

16              MR. PERRY:  Your Honor, this is Lee Phillips.

17              If I may approach?

18              THE COURT:  Certainly.

19              MR. PERRY:  What I'm handing up I understand to

20    be a letter from his daughter to Your Honor.

21              THE COURT:  Mr. Phillips, I'm going to take

22    moment to read this letter.

23              MR. PHILLIPS:  Yes, sir.

24              THE COURT:  Is there an objection or concern if

25    the Court makes this a court exhibit for sentencing

1    purposes?

2              MR. PHILLIPS:  No, sir.  No problem from me.

3              MR. MURPHY:  No, Your Honor.

4              THE COURT:  We'll mark it as Court Exhibit 1.

5              Please proceed.

6              MR. PHILLIPS:  Thank you.

7              Well, it's a long story.  First of all, I'm 79

8    years old.  I've been retired about 22 years and

9    everything else.  And the money that I saved working for

10   Northrop Aircraft I put into a 401(k) and everything else.

11   I had quite a bit of money in there.  I was trying to make

12   enough money to send my four grandchildren to college.

13             So I started reviewing the investments that I

14   had in the stock market and everything else.  And one of

15   them I had a few thousand dollars in and it was going down

16   and no response from the brokers or anything else.  So I

17   decided to close that account and I wasn't even thinking

18   about reinvesting in the stock market.

19             I closed the account, and I don't know how he

20   found out, but Brian Ferraioli called me after I closed

21   those accounts, said, "Hey, I understand you closed your

22   account."  Anyway, we got off the subject and I didn't get

23   a chance to ask the question how did you know or find out.

24   Anyway, he talked me into investing in Lee's, that's one

25   of the stocks that he had listed there.  I bought it

1    somewhere between 4 and 17 cents a share I think at

2    different times, and it did exactly what he said.  He

3    said, well, the price is going to go up four or five times

4    what you paid for it and everything else.  So it went up

5    to about $1.10, something like that, and it looked like it

6    was going up and doing what he said it was going to do.

7            And then all of a sudden the stock dropped and

8    everything else, it came down quite a bit.  And he called

9    me up like he was crying and all, putting on a good show.

10   And told me that he had his boss, who is his tutor, taught

11   him everything on the market, would sell 2 and a half

12   million shares of TREES, I believe it was.  He said,

13   "We'll give you a good deal on this."  So he convinced me,

14   he said rather than take a total loss on this over here,

15   put so much more in here and then you'll get all that back

16   plus.  That was the sale to get me to continue on putting

17   money in.

18           The bottom line is the last one was CBBB, I

19   think it was, was the one there.  And this went right to

20   Brinson, $25,000 deal.  But I never got any proof that the

21   money went into the market or anything else.  I asked

22   Brinson -- not Brinson, but Ferraioli where is my -- you

23   know, where's my stock market?  You got to give me more

24   than just a piece of paper saying you bought stock.  I

25   want the stock certificates.  Never got them.  He said,

1   "Well, we'll work on that when the time comes."

2           So anyway, bottom line is it came up on my

3   account on the internet for a little while and all of a

4   sudden it just dropped out of sight.  I kept trying to get

5   back to Ferraioli, "Where's my money I put in for CBBB?"

6   He said, I can't talk about that now, I've got a deal of

7   on boats and a bunch of other crap and everything.

8           So anyway, the last time -- I called a lot

9   trying to get ahold of Ferraioli.  And I called and he

10  said, "You called 17 times."  He said, "How come you're

11  calling so much?"  I said, "Because you won't answer the

12  damn phone."  Excuse my language.  "You won't answer the

13  phone."  So he said, "Well, quit calling me so much."

14  That was the last conversation I had with Ferraioli.

15          I had over $100,000 invested in the market.  It

16  was about I think somewhere between 115 and 120,000 I

17  believe it was.  But I also invested -- and that was

18  through my LLC.  I have an LLC.

19          THE COURT:  Okay.

20          MR. PHILLIPS:  That was my LLC that purchased

21  that.  Out of my own pocket I purchased another $5,000

22  worth of stock there.  It never did show up.  I mean, it

23  shows up on the screen, but I can't even get in it to try

24  to find out.

25          So right now I only show Lee's and TREE as the

1    two stocks on there.  And they're down.  And that's all I

2    get, to show that.  I think Lee's I had about 89 or

3    80-some thousand dollars invested in that, and that shows

4    zero with that.

5          Now, as a result of all this stuff with my LLC,

6    I'm losing my LLC now if it doesn't do -- I've been trying

7    to invest and go back to flipping houses, but you have to

8    pay cash for homes.  And I've got a couple partners I have

9    been working with trying to get that going.  But if not,

10   I'm going to have to give it up.  I've got a leased car

11   and everything else I'm paying 250 a month for.  So that's

12   going to go.

13         Basically right now, I won't have any other

14   income other than my retirement pay and my social

15   security.  And that's it.  Trying to send four children to

16   college is totally out the window, their whole future is

17   shot.  And as people in this room know, if you don't have

18   an education or a college education nowadays, you don't

19   stand a chance.  And that's the hard part for me.

20         THE COURT:  So it sounds like you lost about 115

21   to about 120,000?

22         MR. PHILLIPS:  I've lost at least 120.

23         THE COURT:  Overall?

24         MR. PHILLIPS:  Overall.

25         THE COURT:  And about $25,000 was sent through

1    your LLC?

2              MR. PHILLIPS:  No, all of it was.  All but 5,000

3    was sent through my LLC.  So it just wiped out my

4    corporation.

5              THE COURT:  I think you mentioned about $25,000

6    was sent to Mr. Brinson?

7              MR. PHILLIPS:  Yes.  I have the bank transfer

8    and everything else.  But it was different than the

9    others.  It showed it going directly to Mr. Brinson

10   instead of into the account.  That was different.  And I

11   think I sent that in.

12             THE COURT:  I think I have that.

13             MR. PHILLIPS:  And it showed it going right into

14   his account instead of into the market.  So I have no

15   proof other than those transfers that I even have any

16   stock at all because I don't have stock certificates or

17   proof or anything else of that.  All I have is what shows

18   the bank transferred into that account.  They didn't

19   follow up with certificates or anything.  You know, that's

20   when I really started getting worried about that.

21             The reason I invested the second time was he

22   said he went to his friend who was his previous boss that

23   had about 2 and a half million shares of this TREE I think

24   it was.  He said he'll sell it to you for 50 cents or

25   something like that a share.

1          THE COURT:  That was Mr. Ferraioli?

2          MR. PHILLIPS:  Yes.  So he talked me into

3    investing more money to make up for the loss of the first

4    one.

5          THE COURT:  Did you ever have any dealings

6    directly with Mr. Brinson or his office?

7          MR. PHILLIPS:  I think I talked to him on the

8    phone one time, but I can't recall for sure.  Most of my

9    activities were with Ferraioli from start to finish,

10   except for Mr. Brinson, who he got the money out of the

11   bank.  That's basically what it boiled down to.  Instead

12   of going into the market and everything else, it went to

13   Corey Brinson.

14         THE COURT:  Did it raise any concerns in your

15   mind at one point part of your payment, the $25,000, went

16   to Attorney Brinson?  Was that important to you?

17         MR. PHILLIPS:  On the transfer slips it

18   showed -- all the others were showing it going into the

19   account.  The last one for 25,000 was the last one I made,

20   it had Brinson's name on it, went directly into his

21   account.

22         THE COURT:  So you kind of learned about that

23   after the fact?

24         MR. PHILLIPS:  After the fact.  And I started

25   trying to get ahold of Ferraioli and find out what's going

1   on.  Like 17 different calls for him different times of

2   day and night.  Finally he called me and said, "What are

3   you calling me so much for?"

4          It was devastating to me, because now I can't do

5   anything for my grandchildren.  That was the big thing.

6   Because it's not affecting me, I'm 79 and I'm not going to

7   be here and all.  But they are.  I just ask the Court's

8   help.

9          THE COURT:  Thank you very much.  And thank you

10   for the letter from your daughter as well.

11          MR. PHILLIPS:  Thank you.

12          MR. PERRY:  Your Honor, Paul Thompson.

13          THE COURT:  Good morning.

14          MR. THOMPSON:  Good morning, Your Honor.  I'm

15   Paul Thompson, I come from Middletown, Maryland.  I'll be

16   73 next Sunday.  I've got a wife and four daughters, nine

17   grandchildren, two great grandchildren.

18          This money that I lost to these guys has greatly

19   impacted us financially.  I wanted to give all my

20   grandkids an opportunity to go to college.  And of course

21   that's all gone now.

22          The other earmarks I had for this money was to

23   pay the mortgage on a place that I'm living which I stand

24   a good chance of losing now.

25          As I look back on my life and what I've done

1    with it, I was born and raised on a farm, worked in

2    construction for 30 years, started a retail garden center.

3    And now I'm reduced to driving a school bus to try to keep

4    my head above water.  It really has impacted us

5    financially as well as the dealing with my wife of making

6    the stupid mistake of losing all this money.  And the only

7    explanation that I can give her is that I thought I saw an

8    opportunity to make enough money to pay our mortgage off

9    and put all of our grandkids through college.  And to

10   explain to her that I've lost all this money to a hoax is

11   pretty devastating for me as a man to try to explain this

12   to my wife.

13         So the amount of money that these guys absconded

14   from me is about $250,000.  And the way I made this money,

15   by hard work and the sweat of my brow, to have them take

16   it at the snap of fingers is just a little hard for me to

17   comprehend and understand.

18         So that's really all I've got to say,

19   Your Honor.

20         THE COURT:  Well, I can certainly understand why

21   you and everybody else who is speaking today would feel

22   this tremendous sense of loss, and you've very much told

23   me how it's more than just about money, it's a sense of

24   your dignity as well, I think, in terms of being fooled in

25   the way that you were.

1           MR. THOMPSON:  Yeah.

2           THE COURT:  And I can imagine what it's like,

3    the difficulties it can have for a marriage and family

4    relations and the kind of situation that you were in.  I

5    appreciate that it would be very difficult to even come in

6    and talk about that in the way that you have today.

7           Did you at any point deal with Mr. Brinson and

8    his office?

9           MR. THOMPSON:  I didn't talk with Mr. Brinson

10   until after the fact when Mike Newman, alias whatever his

11   name is, when I couldn't get in touch with him, I called

12   Mr. Brinson's office and talked with him briefly.

13          THE COURT:  Okay.

14          MR. THOMPSON:  And that was the only time I've

15   ever talked with Mr. Brinson.

16          THE COURT:  And do you remember anything about

17   that conversation?

18          MR. THOMPSON:  I asked him where Mike Newman

19   was, and he said, "Don't send him any more money or deal

20   with him any more.  They're being investigated by the

21   FBI."  That was the only piece of advice that he gave me,

22   that conversation.  So that was the only dealing I ever

23   had with him, because I got his information, wired money

24   to him, from Mr. Newman.  And all the checks that I --

25   weren't checks, it was wire transfers to his account, all

1    that information came from a Mike Newman.

2              THE COURT:  Okay.

3              MR. THOMPSON:  And I didn't deal with

4    Mr. Brinson at all until after I couldn't get in touch

5    with Mr. Newman.

6              THE COURT:  Okay.  And what was your

7    understanding -- when you were sending the money to

8    Mr. Brinson's account, did you know that he was an

9    attorney?

10             MR. THOMPSON:  Yes, I knew he was an attorney.

11   And that kind of cemented my belief that it was a

12   legitimate operation because you have an attorney taking

13   the money and dealing with it, you figure that things are

14   above board and all okay.  You have to have some kind of

15   faith in something, and the law and attorneys is one thing

16   you hope is legitimate.

17             THE COURT:  Yes, we do.

18             Anything else you want me to know?

19             MR. THOMPSON:  I don't think so, sir.

20             THE COURT:  Thank you very much for coming into

21   court today.

22             MR. THOMPSON:  Thank you for hearing me out

23   today.

24             MR. PERRY:  Jerry Krieg, K-R-I-E-G.

25             MR. KRIEG:  I'm Jerry Krieg, K-R-I-E-G.  I'm

1    from Lyme, Ohio.

2          As has already been spoken, this is much more

3    than a financial loss.  It's humiliating, embarrassing.  I

4    remember driving down the road saying you're such an

5    idiot, the sacrifices or the things that my family's going

6    to put up because of my poor decisions.

7          But again, there's times that you question

8    yourself, you said your dignity.  And where I got involved

9    wasn't with Corey, with Tom Havey and the lease through my

10   brokerage account.  And they brokered a few deals or

11   coordinated them.  When that went belly up, I called Tom

12   and said, "What happened?"  He said he doesn't know, he's

13   checking into it, he cannot believe it himself, he's lost

14   lots of money.  But rather than focus on that right now,

15   because that's going to take some time, he has another

16   good opportunity.  I said, "I don't want to deal with

17   another opportunity.  You need to fix this first."  He

18   said, "This is legitimate, it's Continent Beverage, CBBB.

19   In fact, you would send the funds to a lawyer."  Which

20   made it more legitimate.  I did a little bit of research

21   on line, it looked very legitimate, good citizen, served

22   the country.  So you felt good about it.

23          Because my wife and I often talk about a lot of

24   people make a lot of bad choices, but often it comes down

25   to intent.  What's their intent?  And here she keeps

1    saying, "Jerry, your intent was good.  You were trying to

2    make money for the family."  But she said the intent of

3    those who took money is likewise as bad.  Because I didn't

4    want to come today.  I was embarrassed.  I just want to

5    put it all behind me.  But she convinced me to come.  Hey,

6    there's a lot of other people who probably have suffered

7    more than we have.  I think we've heard some today.

8                   THE COURT:  Yes.

9                   MR. KRIEG:  Some people don't have as strong

10   marriages.  This could cost relationships between a

11   father -- or between families and parents, marital stress.

12   So it's a lot more than just financial losses, it's the

13   other things that compound it.

14                  Like I said -- and Tom knew I would not have

15   invested more money without some assurances that he could

16   offer by going through Corey Brinson.

17                  Several months ago he was still saying I'll get

18   the stock transfer, I'll get the stock transfer.

19   Initially they said there was a hold on the stock because

20   once it started trading -- they couldn't all trade at

21   once.  We had to slowly get into it.  You kind of wonder

22   how many people are in this scam.  Obviously Corey is one

23   of them.

24                  Part of my wife's urging me, she goes, "Anyone

25   who is dealing with this deserves their just reward."  It

1    has impacted a lot of hard-earned money, a lot of

2    sacrifices we made along the way.  So I just thank God

3    that I actually have a good wife and an understanding

4    wife.

5            My daughter got married two weeks ago.  I

6    couldn't fund as much of the wedding as I wanted to.  I

7    know my wife knows why.  And just the look.  She doesn't

8    say nothing, but you know it's there.  It's the white

9    elephant.  So it does impact us.

10           My parents, my mom's 86 today.  They've got some

11   health issues, my dad has ALS.  I wanted to use some of

12   this money to help them out.  Well, I'm not going to be

13   able to do that.

14           So I know you've heard from other people.  We

15   all have different positions in life, whether it be in the

16   community or whatever, but being an attorney, I think

17   there is a position that you could trust and respect,

18   clergy, teachers and lawyers, and we all have that.  I

19   think he violated that.  And I'm sure he's done a lot of

20   good things, but it's easy to do good things when you're

21   watched by others.  It's what you do when nobody's

22   looking.  Obviously there was a group of people that

23   thought they could get by with something and they took a

24   lot of money.  That's all I have.

25           Any questions?

1                THE COURT:  Did you deal personally with

2      Attorney Brinson?

3                MR. KRIEG:  The only thing was I did little

4      research on him.  I sent the check to his office.

5                THE COURT:  Is that the 25,000?

6                MR. KRIEG:  That's the 25,000, per Tom Havey.

7      And after that I just dealt with Tom Havey.  I knew the

8      check was cashed.  It was gone.  That's when I went to

9      look for the stock transfer.  A few months ago they

10     couldn't understand why the stock was gone, it doesn't

11     make any sense.  It really begs the question, again, this

12     is just more than one person.  This is a group of people

13     collaborating to commit fraud.  And they've done it.

14               THE COURT:  Thank you.  And I appreciate your

15     willingness to come all the way from Ohio.  Many people

16     have traveled a great distance today to speak.  Best

17     wishes to your spouse.

18               MR. KRIEG:  Thank you.

19               MR. PERRY:  Finally, Your Honor, Dylan James.

20               MR. JAMES:  Dylan James from Burlington,

21     Massachusetts.  D-Y-L-A-N, J-A-M-E-S.  Forgive me reading

22     some of what I say.

23               THE COURT:  However you'd like.

24               MR. JAMES:  The loss of our investment with

25     Strategic Asset Leasing means a lot to my family.  I'm

1    married.  I have two daughters, 16 and 13.  I own a

2    residential construction company building and remodeling

3    custom homes.  I have six employees, work with many

4    subcontractors.  I personally work about 70 hours a week

5    to keep this running, because I feel huge obligation to my

6    family which includes my employees and all their families.

7           In December of 2014 when I was approached to

8    invest in Strategic Asset Leasing, it sounded like a solid

9    deal.  My wife and I saw that it was a valid company and

10   it was being publicly traded.  Gary Bennett of Progressive

11   Gains set up a conference call with who I thought was the

12   CEO and president of LEAS, William Robert Lieberman.  My

13   wife and I at that conference call had an opportunity to

14   speak with them and they answered some of our questions.

15   We were told in less than two weeks the shares would be

16   deposited directly into our account and would be

17   immediately free traded.

18          We were instructed to wire the money directly

19   into the escrow account of the Law Office of Corey J.

20   Brinson.  The money was to remain in escrow until the

21   transfer of the stock was complete.  Our two agreements

22   were actually signed by Corey Brinson, legal counsel for

23   Strategic Asset Leasing.  Mr. Brinson later confirmed by

24   e-mail that my client is in agreement, referring to LEAS,

25   with our proposal that the entire $50,000 investment would

1  be for the total of 333,333 shares at the overage cost of

2  15 cents a share.  To date, we have not received any

3  refund of our money and we have not received any shares in

4  Strategic Asset Leasing.

5          The involvement of Corey Brinson and the promise

6  of the proper use of his escrow account made us

7  comfortable because Attorney Brinson is held to a higher

8  standard of professional ethics.

9          I called Attorney Brinson several times over the

10 years to get information on the status of our investment

11 without any solid answers.  We would usually receive a

12 call back from Michael Newman at Sterling Mayfair who

13 would usually provide answers about what was going to

14 happen next quarter.  There was talk of an advertising

15 campaign that's going to happen next quarter or the stock

16 split's going to happen and then the shares would be

17 issued, and of course it never did.  Two weeks turned into

18 over two years and here we are.

19         Attorney Brinson's involvement was an

20 instrumental part in our commitment to this agreement.  I,

21 to this day, do not understand how the money was released

22 from escrow without fulfilling their part in the

23 commitment.  Mr. Brinson was involved and should be

24 responsible to make full restitution to all of his

25 victims.  Mr. Brinson stole from my family.  Our

 1  investment which we trusted Mr. Brinson with is a year of

 2  college tuition for our daughter that's coming up.  This

 3  was a huge financial loss to our family, and Attorney

 4  Brinson should be held accountable for his involvement.

 5         That's all I have to say.

 6         THE COURT:  Thank you, sir.  I very much

 7  appreciate your coming in today.

 8         MR. JAMES:  Thank you.

 9         MR. PERRY:  That's it from the government.

10         THE COURT:  All right.

11         And I'll just say to all those victims who have

12  testified today -- and I don't know if there's anybody

13  here who is a victim who has not testified or spoken?

14         MR. PERRY:  No, I don't believe so.

15         THE COURT:  I'll just underscore how important

16  it is, important to me that you came today in terms of

17  talking about the effect that this has had on you, and I

18  think it's important to other people who couldn't be

19  coming to court today, essentially you stood up and talked

20  about the enormous harm that you've suffered.  Very much

21  appreciate your willingness to come in today.

22         Mr. Murphy.

23         MR. MURPHY:  Thank you, Your Honor.

24         Your Honor, needless to say, this is a sad day

25  for everyone involved.  The victims' stories we've just

heard are very troubling.  These people have all suffered

very painful, real losses.  At the same time Corey Brinson

has thrown away a very promising career that he worked

really hard for and deserves to be here to be punished

here today and he recognizes that.  The question for the

Court, of course, is a hard one of balancing the good of

Corey Brinson against the crime he committed that brings

him here today.

       And one thing I'd ask the Court respectfully to

keep in mind is who is not here today.  At this point the

Court doesn't have before it Christian Meissenn and the

other people we understand are likely to be charged in the

future in this matter, the people who actually were doing

the selling.  Because in matters, Your Honor, they were

the ones who handled the direct dealings with these

victims.  And while, as we've said in our submissions to

Your Honor, Mr. Brinson, what he did was wrong and we

don't dispute that at all, but he didn't know this was a

pump-and-dump scheme and we suggest that that makes a

difference in the outcome for him.

       As I said, his crime needs to be measured

against the backdrop of his life.  As Your Honor knows, he

grew up poor in a dangerous neighborhood.  And with the

help of his mother, he got an education and he avoided the

drugs and gangs that surrounded him daily.  Through hard

1   work and sacrifice, he achieved goals that very few in his

2   community have the opportunity to do and, as you know,

3   went on to became a lawyer.  And his moment of weakness

4   came when he returned to Hartford to open up his solo

5   practice.  He needed work.  He at that point no longer had

6   anyone guiding his professional decision-making, and he

7   allowed himself to be drawn in by Christian Meissenn.

8           The bad decisions he made that bring him here

9   today should be measured against many good things.

10  Your Honor mentioned you've read the letters, and I am

11  going to ask a couple of people to speak on Mr. Brinson's

12  behalf.

13          THE COURT:  They're welcome to, of course.

14          MR. MURPHY:  What I think is a fair summary of

15  what Your Honor has seen from the letters that were

16  provided to you is the real Corey Brinson is a loving son

17  and fiancé, he's a loyal friend, he's a decorated veteran.

18  He gives freely of his time to help others in his

19  community by mentoring young people and in the past by

20  representing people pro bono when they couldn't afford it

21  themselves.  He's someone who people in his community

22  looked up to as a role model, and many of those whom have

23  reflected in their letters to Your Honor realize that he

24  still can be a role model even in light of what has

25  happened to this point.  And they firmly believe he will

1    rise from this fall and make something of himself again.

2              And Your Honor, if I may, there are, as I said

3    earlier, numerous family members, friends and former

4    professional colleagues here.  If I could have several of

5    them come up and make brief remarks.

6              THE COURT:  That would be great.  I'll have just

7    a few questions for you at an appropriate point about the

8    restitution issues and some of the points that are made in

9    the government's sentencing memorandum about some of the

10   specific exhibits, but however you'd like to structure.

11             MR. MURPHY:  Understood.  Thank you, Your Honor.

12             If we could ask Corey's mom to come up.

13             THE COURT:  That would be great.  Come on up.

14             MS. BRINSON:  Good morning, Your Honor.

15             THE COURT:  Good morning.

16             MS. BRINSON:  I hope you were able to read my

17   letter regarding my son Corey.

18             THE COURT:  I did.  It's right in the front of

19   the packet.  I have it right here.

20             MS. BRINSON:  Oh, great.

21             As I stand in front of you today, all I ask for

22   is mercy on his behalf.

23             As his mother, I see a young man who is truly

24   remorseful for all that has happened and more regretful

25   for shaming his profession and his family.  When we're

1    young, we set out to conquer the world, establish our

2    goals to achieve and to become a positive pillar in our

3    community.  As we age and mature, we find wisdom along the

4    way from our errors.  And I know Corey has learned some

5    valuable lessons from this ordeal.  So in your ruling,

6    please consider Corey's background, his dedication to the

7    community and his family, and most importantly his

8    determination to make amends to those involved.

9              Thank you so much.

10             THE COURT:  Thank you.  Thank you for coming in

11   today.

12             MR. MURPHY:  Your Honor, Julie Johnson,

13   Mr. Brinson's fiancée.

14             THE COURT:  Good morning.

15             MS. JOHNSON:  My name is Julia Johnson.  I am

16   Corey's fiancée.

17             I know Corey as an honest, generous, and

18   selfless gentlemen.  I've seen what a great role model he

19   is in the community.  We have been out in the community

20   and we have been stopped by a lot of young black men

21   thanking Corey for being a positive, professional

22   African-American male citing education and deferred

23   gratification does work.  He can still be a positive role

24   model by showing there are consequences for good choices

25   and poor choices, but those poor choices do not have to

1    define your life.

2         I come from a very close-knit family.  Corey has

3    assimilated to the demanding family structure.  My dad is

4    a lawyer and Corey and him have built an amazing bond.  My

5    dad identifies deeply with Corey, both having been from

6    impoverished neighborhoods, becoming attorneys and making

7    mistakes along the way.  My dad acts as a father figure to

8    Corey, encouraging him and me through this difficult time.

9    My family loves and supports Corey and will help him

10   through the other side of his legal troubles.

11        Leading up to his sentencing, Corey has shown

12   remorse.  I know because I'm there with him every day.  He

13   does not sleep through the night.  He has depression and

14   drinks too much to escape the guilt, regret, and sorrow he

15   feels.  He speaks about the victims and the community he

16   let down.  It was important to him to accept

17   responsibility.

18        People have asked me why I support Corey with

19   him losing his license, his business, reputation, and his

20   freedom.  But I believe sincerely he is apologetic.  He

21   has admitted his mistakes and I know that he will rebound

22   as a better man, a community servant, a husband and a

23   father.  Corey and I don't have any children and I will be

24   37 years old this year.  A long sentence could mean that

25   Corey does not get to have a child with me, and that would

1    be a harsh penalty for us.

2         I support Corey's willingness to accept

3    responsibility for what he has done.  He knows he made a

4    poor choice and he wants to indemnify the victims even if

5    that means he cannot buy or do things for me.  He has

6    candor about his wrongdoing and has vigor to reestablish

7    his personal and professional credibility.

8         I know this is ultimately your choice,

9    Your Honor, but I humbly ask for fairness and leniency in

10   your sentencing.

11        THE COURT:  And thank you, Ms. Johnson.

12        MR. MURPHY:  Your Honor, Destiny Asberry.

13        MS. ASBERRY:  Hi, Your Honor.  My name is

14   Destiny Asberry.  I'm 28.  I am from the North End of

15   Hartford.

16        I'm here today to talk about a man with a big

17   heart.  He's from the same neighborhood as I am.  He not

18   only saved my life before, he saved my son.

19        I have a six-year-old son.  I grew up in a

20   broken home.  I was left to be raised by my grandmother.

21   And my grandmother struggled with drug addiction.  She

22   raised ten children in a two-bedroom apartment.

23        I met Corey Brinson before he was a lawyer.  I

24   was in the sixth grade at Dr. Martin Luther King

25   Elementary School where he was my substitute teacher while

1    studying law.  He always wanted to help the inner-city

2    children.  He showed us and gave us the attention that we

3    needed.  He was always one call away.

4           A couple years ago I needed his help and he

5    never hesitated.  Even in my adult life he has never

6    turned his back on me.  I needed him a couple years ago.

7    He took a serious case that could have caused me to have a

8    criminal record, and he did it pro bono because I couldn't

9    afford him.  I don't make a lot of money.

10          We need men like Corey Brinson.  So many young

11   men look up to him.  He has always been the one to show us

12   it's not where you're from, you can do anything, you can

13   be anything, just work hard at it.  Taking him away would

14   be like taking another father, a big brother, another role

15   model, somebody that I look up to.

16          I just want to say, I thank Corey for everything

17   he ever did for my community because he has done a lot.

18          And I just want to thank you for listening.  And

19   please be sympathetic because he's taken full

20   responsibility for his actions and we need him in our

21   community.  We really do.  There's not enough men like

22   that in my community.  I don't see enough.

23          So thank you so much for listening to me today.

24          THE COURT:  You mentioned your six-year-old son.

25          MS. ASBERRY:  I have a six-year-old son.

```
 1              THE COURT:  Has Corey helped out with your son?
 2              MS. ASBERRY:  Corey saved me.  He saved me.
 3   Because I was facing a charge.  And if he didn't do it --
 4   I couldn't afford a lawyer.  I don't have money.  I'm a
 5   cashier; I don't make a lot of money.  But he did it.  He
 6   never hesitated.  When I asked for help, he never
 7   hesitated.  He said, "I'll help you.  No charge."  And to
 8   me, that was the best thing he could have ever done for
 9   me.  Because now I'm at home with my son.  And I'm
10   working.  And I'm really, really grateful for that.
11              He does a lot.  He does a lot of good things in
12   my community, he does.
13              Thank you so much.
14              THE COURT:  Thank you very much.
15              MR. MURPHY:  Your Honor, Attorney Mark Dubois.
16              MR. DUBOIS:  Good morning, Your Honor.  I don't
17   know if you need me to spell my name.
18              THE COURT:  No, I don't think so.
19              MR. DUBOIS:  I met Corey when he was a student
20   of mine at UConn Law School.  I was teaching in the
21   evening division.  He sat second row right in front of me.
22   He was a sponge.  He wanted to be there.  He was there
23   early.  He just was everything a teacher could want in a
24   student.  He drank deeply from that cup.  And he was so
25   glad to have that opportunity.
```

1          Later I coached him in trial advocacy and he was

2     one of our stars.  He traveled around the country,

3     sometimes with me and the team, sometimes by himself.  I

4     remember he was down in Pennsylvania, came back as best

5     oral advocate, had a picture of himself with Barry Scheck

6     and we were so proud of him.  When he left the school, we

7     said okay, that's one in the "win" column.

8          He came back to Hartford a few years later, I

9     was Chief Disciplinary Counsel.  He showed up in a case

10    shortly after he came back at the appellate court opposing

11    us.  And I said to my colleague Patricia King, "Be

12    careful.  Do not underestimate him.  Be prepared for the

13    argument because he's good."  And he really he lived up to

14    his billing.  And so I followed him after that.  And then

15    Pat joined me and we worked together to the extent we

16    could rough out -- smooth out the rough patches.

17         The big concern that we always have -- and I

18    wear many different hats: a mentor, an educator, a bar

19    leader, a disciplinary prosecutor, and now disciplinary

20    defender -- is young lawyers in unsupervised practice,

21    they don't know what they don't know.  They are prey to

22    all sorts of opportunists who realize that they can use

23    them in their position and their authority to achieve bad

24    ends.  This issue of the misuse of the clients' funds

25    accounts is a recurring theme.  I've dealt with lawyers,

1    prosecuted them and defended them, who had a lot more

2    experience than Corey and made the same mistakes.

3              I can tell you that what he's accused of is not

4    Corey Brinson.  This is not a person who had malice in his

5    heart.  This is a young lawyer who did everything right.

6    He took young students through the appellate court.  He

7    took them on court visitations.  He spoke in the schools.

8    He was in so many respects what we need to diversify the

9    bar.

10             And I was speaking with my wife this morning.  I

11   said, you know, to some extent, his failure is my failure

12   and our institutional failures because these young lawyers

13   come out, first generation, as am I, they have no

14   institutional support, they have no professional network,

15   they don't know what they don't know and they make

16   mistakes and it's a harsh environment.

17             I have to admit that he is -- he stood up and he

18   said, look, I could have asked a lot more questions.  I've

19   had some tough talks with him.  I said if you had asked

20   me, I would have told you; in so many ways we could have

21   headed this off.  But he was proud.  And he thought he had

22   achieved -- and he did achieve a lot, especially

23   considering where he came from.  And perhaps he was too

24   proud to ask for advice.  And maybe it never occurred to

25   him what was wrong.

1          As I heard one of the victims say this morning,

2     you know, as soon as he got wind that this was a problem,

3     he was telling people to run from these people.

4          And you know, I've worked with him on the

5     surrender of his license.  Let me tell you, there were

6     tears from him and there were tears from me.  It's a

7     tragedy.  And I know you and you know me, and I know

8     you'll do what's right when it comes to sentencing.  Thank

9     you.

10          THE COURT:  So I want to ask a couple of

11     questions.

12          First of all, for those in the room who are not

13     from the Connecticut legal community, Mr. Dubois, you're a

14     leader in the Connecticut legal ethics field and you've

15     taught so many years in UConn in the ethics field.  I used

16     to teach in the ethics field as well at another law

17     school, Quinnipiac Law School.  And I was delighted that

18     you were able to come and speak to some of the classes

19     that I taught there.

20          MR. DUBOIS:  Thank you.

21          THE COURT:  This is such a hard case because

22     Mr. Brinson's not simply a person who was in a position of

23     trust but was an attorney who has that very highest sort

24     of trust position, kind of a super trust position, I think

25     you probably agree --

1          MR. DUBOIS:  Absolutely.

2          THE COURT:  -- in terms of enforcement of the

3     rules.

4          We heard so rawly from the victims today about

5     how they thought they could give their money because it's

6     going to Mr. Brinson, at least one of them, if not more,

7     even looking him up online and seeing this is something

8     who is legit, who is public service oriented.  That's what

9     makes this hard.

10         And what I have a hard time understanding in

11    part is how if Mr. Brinson in fact had doubts or was kind

12    of naive about this, he had an unusual kind of pipeline to

13    you as maybe Connecticut's top ethics person, I'd say

14    you're the top person that he could have called to ask is

15    it okay to take three-plus million dollars and cycle it

16    through my IOLTA account?  Is it okay to do that and

17    accept a 5 percent cut on that ostensibly in return, I

18    don't know, in return for some lawful legal services that

19    were being done?  He not only had you, he had essentially

20    the leadership or the so-called deans of Connecticut's

21    largest law firm to call upon, people who were just icons

22    in the field.  It seemed like nobody got the call.  And I

23    think the concern I have is it wasn't just the use of the

24    IOLTA account and putting $3 million through, essentially

25    using it as a business account, which I don't think is the

1   purpose of an IOLTA account, it's essentially for purposes

2   of holding money in trust kind of where it's moving in

3   connection with representational transactions, but also

4   the letters that we see, the securities counsel letters

5   that Mr. Brinson signed for a period of time until he

6   backed out of that.  It didn't take a securities expert to

7   know he had no business signing those.  How could he sign

8   these letters saying he's looked at these companies'

9   internal records and vouches that, based upon his review,

10  that they're in compliance with umpteen sections of the

11  securities laws?  You don't have to be a securities

12  lawyer, do you, to know that when you're doing that,

13  that's just fraud.  That's fraud.  And it's not -- so

14  that's what I have a hard time with here in connection

15  with that.

16          And I'm asking you that because you are an

17  ethics expert and I know you represent Mr. Brinson at this

18  point, but those are the doubts that I have in my mind.

19          MR. DUBOIS:  All valid observations and

20  concerns.  The problem that I've seen in other cases is

21  when you are starting these things, you don't start at

22  100 miles an hour, you start at .5 miles an hour and you

23  slowly get involved in these things.  And a combination of

24  inexperience and trust and naivete.

25          You speak of the deans of the bar, God bless the

1   folks at Day Pitney who mentored him from high school.

2   And I was at an American Board of Trial Advocates dinner

3   and Al Zakarian came over the other day, he said, "What

4   happened to Corey?"  We were talking about it.  He said,

5   "You know, he was always a little bit naive."  I said,

6   "Well, Al, you know, naivete takes you to a point."

7          But in retrospect, in hindsight, so many things

8   could have happened differently if he had asked me.  I

9   know in the presentence memo brother counsel prepared,

10  there was some discussion of Mr. Meissenn's prior counsel.

11  And if he had even asked me about that lawyer, I would

12  have told him what happened.  He didn't have a heart

13  attack, he committed suicide several hours after I spoke

14  to him about a prosecution of mine.  And I would have

15  asked him, what are you doing with his clients?  And there

16  are so many ways that this train could have been put back

17  on the track.  And retrospect, there were all these missed

18  opportunities.  As I was sitting here in the audience, I

19  said I should have videotaped this and used it for an

20  ethics lecture, bring the classes in here.

21          I still represent lawyers and young lawyers.

22  And I was with a young lawyer of color who went to

23  UConn -- not UConn Law School but undergraduate with

24  Corey.  He said to me the other day, "How do I make sure

25  that that doesn't happen to me?  How did this happen?"

1    And he's not the only one.  And the problem is, we don't

2    have a robust institutional support social network,

3    professional network the way the bar is set up.

4    Especially in the solo, unsupervised practice.  They're

5    all on these islands.  And Pat King said to me yesterday,

6    "All he had to do was call."  But, you know, they don't.

7    And it's a hard lesson learned.  And it's a tragedy.

8    There's victims all around.  Nobody is a winner in this

9    situation.  And I don't -- I'm glad I'm over here and not

10   there having to make the decisions you have to make today.

11             THE COURT:  Anything else?

12             MR. DUBOIS:  No.  Thank you, sir.

13             THE COURT:  Thank you for coming in.

14             MR. MURPHY:  Your Honor, if I may just at this

15   point jump in and answer the question Your Honor has put

16   as best we can.

17             There is no perfect answer to Your Honor's

18   question.  And it is a perfectly valid question.  But I

19   think it is the case that the best it can be answered is

20   along the lines of what Attorney Dubois just explained.

21   It is a combination of inexperience and lack of anyone

22   right there at the moment to turn to, the difference

23   between being in a solo practice and having somebody in

24   the office next door is you do have to take the next step

25   to check with somebody.  And here we're not trying to hide

1    the fact that Corey knew as he was getting into this that

2    he shouldn't have gotten into it.  But it was incremental

3    steps along the lines of what Attorney Dubois said, that

4    he had no idea as this started that it would become what

5    it is today.  And unfortunately, once down the slippery

6    slope, it keeps going.  So he did, in theory, have those

7    resources.  He did not reach out to them, as Your Honor

8    knows.  And no doubt in part because he knew what the

9    answer would be, perhaps, at least to some extent.  He

10   knew it was not right to help Christian Meissenn hide from

11   his judgment creditors or later on to know that he should

12   hide from regulators.  We're not suggesting he didn't

13   realize those were problems.  What he didn't realize was

14   that this was going to lead to people being hurt the way

15   they have been.  It's bad, obviously.  He could have

16   reached out; he didn't.

17            One more person, if I may, Your Honor?

18            THE COURT:  Certainly.

19            MR. MURPHY:  Attorney Thomas Farrish from Day

20   Pitney.

21            THE COURT:  Good morning.

22            MR. FARRISH:  Good morning, Your Honor.  My name

23   is Tom Farrish, F-A-R-R-I-S-H.

24            I am a law school classmate, former law firm

25   colleague and friend of Corey Brinson's and fellow veteran

1    as well.  I've known Corey most of his adult life.  We met

2    in the first month in law school in September of 2002.

3          Your Honor, I and all of Corey's friends in the

4    legal community are just heartbroken to see him here

5    today.  And we're also heartbroken to hear about all of

6    the harm that he has caused to the lives of so many

7    people.  I'm not here today to try and excuse anything

8    that Corey has done and, as an attorney, I feel the stain

9    on our profession of these proceedings today.

10          But the principal reason why I'm not here to try

11   to excuse anything that Corey has done is because Corey

12   himself wouldn't want me to do that.  So instead of trying

13   to excuse anything, my purpose, Your Honor, is just to

14   share a few memories of Corey in the hopes that they might

15   help the Court know what all of his close friends in the

16   legal community know; namely, that Corey doesn't find

17   himself here today because he's a malevolent guy.  He's

18   not a malevolent guy, as Attorney Murphy says.  He doesn't

19   have any malice in his heart.

20          Reading the newspaper accounts and squaring them

21   with what we know about Corey, his friends think he's here

22   today because he chose to swim in financial waters that

23   were way out of his depth.  And he didn't recognize the

24   sharks as sharks until he was way out in the ocean.

25          Now, Your Honor asked about, you know, gee, you

1  don't have to be a securities lawyer to know that certain

2  things are just wrong.  And I couldn't agree with that

3  more.  With that said, I do think it would be helpful to

4  put it in a frame of reference of Corey's level of

5  financial sophistication.

6          The Court has heard about Corey's upbringing,

7  how he grew up on tough streets in North Hartford where

8  not only did nobody own any stocks or bonds, people didn't

9  even have checking accounts or car loans.  By the time we

10  started law school together in September of 2002, Corey

11  was already ten rungs down in the financial sophistication

12  game.

13          I was thinking as I was coming here of a couple

14  of anecdotes that may make that come alive to the Court.

15  I remember when we were both interviewing for positions at

16  the former Day Berry & Howard, neither of us had two

17  nickels to rub together, and I was fretting to Corey about

18  the cost of parking for our interview in the old CityPlace

19  building in Hartford, it was going to cost me $20 that I

20  didn't have.  And I recall saying to Corey, "Gee, I don't

21  know whether to ask them to validate my parking.  You

22  know, that's not what I want to do in an interview."  And

23  Corey's question to me was, "What does validate parking

24  mean?"  Corey didn't even understand that.

25          Later on when we were I think second- or

1   third-year associates, we had some litigation in the firm

2   involving Enron.  And we were out at a cocktail party one

3   night, I think it was at the Red Plate on Asylum Street in

4   Hartford.  And we were standing around talking about

5   Enron's investment bankers and somebody brought up the

6   name Goldman Sachs.  And Corey says, "What's a Goldman

7   Sachs?"

8        I would agree with Your Honor that certainly

9   there's some things that you don't need to be a securities

10  lawyer to know are wrong.  But at the same time I think

11  it's within a frame of reference of a guy who just started

12  ten rungs down from the rest of us.

13       Your Honor, as between two competing visions of

14  Corey Brinson, first a fundamentally decent if naive guy

15  who stumbled his way just into an awful situation, and

16  second, a malevolent schemer who knew every step of the

17  way what he was doing was wrong, Your Honor, his friends

18  know that the first version is really the true Corey

19  Brinson.

20       Thank you, Your Honor, for considering my

21  remarks today.

22       THE COURT:  Can you help me understand a little

23  bit about -- Mr. Brinson was at the firm for about three

24  years, right?

25       MR. FARRISH:  He was, Your Honor.

1          THE COURT:  And went in at the same time as you?

2          MR. FARRISH:  He did.  We started the same day.

3          THE COURT:  Did you get any training by

4   Connecticut's largest law firm about how to handle client

5   monies?

6          MR. FARRISH:  Well, on how to handle client

7   money, Your Honor, as first-year associates that's not the

8   first thing.  Those checks don't pass through us.  We did

9   receive training, but it wasn't the first part of the kit

10  in the first-year associate.  With that said, Your Honor,

11  if the question is do we feel a sense that we could have

12  done better here, the answer to that is absolutely yes.

13          Mr. Brinson left our firm.  He went to a firm in

14  Washington, D.C.  When he came back, I think that his

15  friends at the bar should have grabbed him by the lapels

16  and said, Corey, you really can't go into a solo practice.

17  We think you really should get yourself associated with a

18  firm so you have a general counsel, so you have a new

19  matter committee to bounce things off of.  And if that had

20  happened when as I understand Mr. Meissenn came to him and

21  said will you be my securities lawyer, somebody would have

22  told him, Corey, this is out of your depth, and his part

23  in the scheme would not have happened.  So we do feel a

24  sense that this could have gone differently if we were

25  checking in and grabbing lapels, and we're very sad that

1    it went the way it did.

2         THE COURT:  Did you work on any cases with

3    him -- I don't want you to go into the matters -- when you

4    were at the firm?

5         MR. FARRISH:  No, Your Honor.  But I do know the

6    types of cases that he worked on.  They kind of do

7    reinforce this point of a little bit of a lack of

8    financial sophistication.

9         So Mr. Brinson, to his credit, when he was in

10   law school, he did not stock up on all of those commercial

11   courses like those of us preparing for well-paying careers

12   at big law firms take, the securities law, securities

13   transactions and so forth.  He took kind of lunchpail

14   courses to help prepare him to help the people out in his

15   community, personal injury, employment law.  So when he

16   came to our firm, he worked on employment law cases.

17   Typically, because he was a junior associate, smaller race

18   and gender discrimination cases where the most

19   sophisticated thing he might have to deal with is perhaps

20   the 1040 of a terminated employee.  Really nothing more

21   sophisticated than that.  So, you know, when somebody came

22   to him and talked to him about transfer agents and opinion

23   letters and so forth, that wouldn't have been on all fours

24   with anything he did at our firm.

25        THE COURT:  One more question.  Mr. Brinson has

 1    an admirable record of having served in the Armed Forces,

 2    Air Force.  Can you talk at all, speak at all to that?

 3              MR. FARRISH:  I can, Your Honor.

 4              I'm a veteran of the Marine Corps.  Mr. Brinson

 5    is a veteran of the Air Force.  There were very few of us

 6    on campus, veterans.  Of those few, most of them had been

 7    officers.  I can think of one other gentleman who had been

 8    an enlisted man.  So we kind of bonded together over that

 9    a little bit.  It's in the nature of Marines to kind of

10    rib the Air Force guys because we, of course, don't think

11    they're as tough as we are.  But Corey kind of brought me

12    up on that.  He said, "Let me tell you about September 11

13    of 2001, you know, when I was in Saudi Arabia that day and

14    all the claxons were going off and we were worrying when

15    the next truck bomb was going to come and blow up the

16    base."  It kind of gave me pause.  It's definitely an

17    honorable service that any marine could respect.

18              It also dovetails with what I'm saying about

19    kind of starting ten rungs down on financial

20    sophistication.  If you're an officer, you have budgets.

21    You have a training budget for your unit and so on and so

22    forth and you deal with managing those kinds of complex

23    financial operations of increasing complexity as you rise

24    in the ranks.  As an enlisted man, you deal with nothing

25    like that, and there's nothing in his military training

1    that would have prepared him for the day when somebody

2    came to him and said be my transfer agent.

3              THE COURT:  Thank you, sir.

4              MR. FARRISH:  Thank you, Your Honor.

5              MR. MURPHY:  So Your Honor, I would like to

6    address the guidelines at this point, if that's okay, and

7    if Your Honor any questions.

8              One last thing, if I could, back to your

9    question raised with Attorney Dubois.  What I think may

10   not be fully coming through is the extent to which perhaps

11   Corey's personality has hurt him in some respects, because

12   he is a trusting person.  So he did trust the people who

13   came to him with this deal that they would take care of

14   the things he didn't understand.  And I recognize that's

15   not appropriate, but I think that is what lays beneath a

16   lot of this.

17             Your Honor, with respect to the guidelines, as

18   you know from the sentencing memorandum, both sides agree

19   that the 51- to 63-month range called for by strict

20   application of the guidelines seems too severe.  And

21   certainly that's our position.

22             As Your Honor knows, we've identified a number

23   of different grounds for potential departure or variance.

24   I know Your Honor's read them.

25             THE COURT:  Yes.

1          MR. MURPHY:  Just to summarize what they are,

2     the guidelines for loss overstate in these circumstances

3     where Mr. Brinson was unaware of the fact that this was a

4     pump-and-dump scheme, that Mr. Brinson lacked

5     sophistication in the way he did this.  And while it's

6     true that, from the perspective of Mr. Meissenn and

7     others, using his IOLTA account affected a layering of the

8     money, it didn't affect the layering as to Mr. Brinson; it

9     put it right in his wheelhouse into the point where it was

10     very easy to identify him and his role once it was known.

11          We pointed out that he's been punished

12     significantly.  He has, as Your Honor knows, given up his

13     law license.  He did, by the time this ended, have a

14     thriving solo practice unrelated to whatever was going on

15     with Christian Meissenn.  And that business is lost and

16     may very well may be lost permanently.

17          As Your Honor just heard, he volunteered in the

18     International Guard and did so during a critical time in

19     the nation's history.

20          He is a volunteer in his community, as

21     Your Honor knows.

22          And the two other variance points we note is the

23     fact that the guidelines here are disparate from the

24     national median.  The national median for all money

25     laundering is 26 months, the median in the Second Circuit

1    is 18 months.

2              THE COURT:  That median, though, is calculated

3    without reference to the amount that's involved, I take

4    it?

5              MR. MURPHY:  I think that's right, Your Honor.

6    I think it's just a straight median of all 600 some odd.

7              THE COURT:  So we don't have samples of other

8    cases that involve $3 million of funds.

9              MR. MURPHY:  That is correct.

10             And then finally, Your Honor, just on the

11   *Kimbrough* point, that no deference is due to 2S1.1 not

12   being the product of empirical analysis.

13             THE COURT:  I understand that.

14             MR. MURPHY:  Your Honor, we're asking the Court

15   to fashion a sentence that recognizes, as I said earlier,

16   both the good and the bad of -- the good of Corey Brinson

17   and the bad of the crime and the harm that's been caused

18   here.  And we ask Your Honor to consider that

19   incarceration need not be very long to make the point to

20   him; and as we indicated in our reply memo, nor to others

21   as well.  The idea that someone needs to go to jail for an

22   extended period to make the point to professionals that

23   they can't do this I think is fictional in that anyone who

24   knows what Corey Brinson has suffered from the perspective

25   of another lawyer looking at it is going to recognize that

1   this is the third rail along the lines of what Mr. Dubois

2   was saying, no one is going to -- I want to make sure this

3   doesn't happen to me.

4            In addition to whatever time he serves, we

5   believe he can really do more in the community when he

6   comes back out.  He is at the moment, as you know,

7   volunteering with Capital Workforce Partners.  We would

8   like to propose that when he comes back out, he try to at

9   least try to fill some of the gap Mr. Dubois was talking

10  about for the solo lawyer market by working with the young

11  lawyer section, speaking to people about what has happened

12  to him.  We don't have a camera here today to replay all

13  of this, but he can tell it in his own words, and I think

14  those kind of first-person telling can have great effect.

15           And then, Your Honor, with respect to

16  restitution efforts he has made to date, as Your Honor

17  knows, he has -- I believe we've pointed out in the past

18  that there was one victim to whom he has already paid

19  $2500 directly, Mr. Eigenberg.  In addition to that,

20  Mr. Brinson has provided me another $17,500 that I am

21  holding in escrow at this point, for a total of $20,000,

22  the last $7500 of that having just come to me this week.

23  Mr. Brinson just got one of these last hanging personal

24  injury settlements, and that is his fee from that case.

25  And I just received yesterday the $15,913 from the IOLTA

1   account, the Superior Court just entered an order

2   yesterday allowing that transfer to be made.

3          And Your Honor, if you would just allow me one

4   personal observation.  The way I came to know Mr. Brinson

5   was we represented co-defendants in a civil case several

6   years ago.  And through that experience, I got to witness

7   just how much Corey Brinson loved being a lawyer.  Since

8   July of last year, Corey has spent more time with me than

9   I'm sure he would care to.  And in that time I have

10  witnessed just how much he's hurt by what he's done to

11  himself, to his family, to his community, and to these

12  people he now realizes are victims of this whole scheme.

13  As people have said, he's sincere.  He is at heart a good

14  person.  And he has been completely forthright in coming

15  and admitting what he did.

16         And so for all those reasons, we'd ask the Court

17  to take very seriously the parsimony clause in considering

18  what is a fair sentence.

19         With the Court's permission, Mr. Brinson would

20  like to speak.

21         THE COURT:  Thank you, Mr. Murphy.

22         Mr. Brinson.

23         THE DEFENDANT:  Good morning, Your Honor.  I'd

24  like to speak, and if you have any questions for me, I

25  would like to answer any difficult questions that you

1    might have.

2              THE COURT:  Of course.

3              THE DEFENDANT:  I wanted to do this back in

4    December when we first came and then we came back in

5    January, but it's never too late to do the right thing.

6    So I wanted to apologize not only to the Court -- not to

7    turn my back on you -- but the people in this room.

8    They're not just investors or victims; they're people.  I

9    was sickened to my stomach when I read their letters to

10   hear about how their financial loss impacted their

11   emotional state; their inability to do for the

12   grandchildren, which I know is a dream of many people,

13   their inability to provide college education, I know what

14   that's like not to have money for school; for retirees to

15   have to go back to work and to do those things.  So I want

16   to apologize to all those people today that me being

17   involved helping Christian Meissenn do something that he

18   wasn't supposed to be doing, how that caused their loss.

19   And I'm truly sorry for that, I really am.  And it hurts

20   me every day that my name is associated with that, but

21   that was the ultimate consequence.  And I know they didn't

22   come to hear excuses from me.  I want to accept full

23   responsibility for my actions.  It was my name on those

24   opinion letters.  My name was in the letterhead, Corey J.

25   Brinson.  I had no business getting involved with that

 1    because I didn't know anything about that.  And I ended up

 2    just defaulting to trusting them in helping me doing

 3    versus just doing them myself, even though I tried to do

 4    them but I didn't know what I was doing, so I should have

 5    never been involved.  I knew better than that.

 6            I don't make any excuses for that.  That was my

 7    mistake, my weakness, at that moment I should have said

 8    no.  But I didn't.  And it led to these people being hurt.

 9    I didn't foresee that at that time, but these are real

10    people with real losses.  And I'm genuinely, genuinely

11    sorry about that.

12            I also want to apologize, Your Honor, more

13    apologies to all the lawyers that are in the room.  I

14    shamed the profession.  There's going to be additional

15    articles today about another attorney shaming the

16    profession.  And I'm really sorry to the bar and the many

17    officers of the Court that are sitting over on my side,

18    and Your Honor and everybody else that are attorneys that

19    I'm sorry to be a part of that.  I really did -- it was my

20    childhood dream was to be a lawyer.  It was the only thing

21    I ever wanted.  It was what got me up and studying and

22    working hard.  I wanted to be the best trial lawyer there

23    ever was.  And I -- I blew it.  And before I met Julia,

24    that was all I had, was being a lawyer.  That was

25    everything that I worked really hard for.

1        And it hurt me a lot, too, to hear -- when

2    Destiny spoke.  Because I'm from a community where I know

3    ten people who were murdered.  I have a lot of friends

4    that you sentenced for other crimes.  And while I made

5    other different decisions with my life, I kept those

6    friendships.  And those people always -- I was a hero in

7    my community.  Like, Corey, you became a lawyer, you're

8    one of us.  And it really hurt me to hear Destiny, because

9    so many people told me I used you as an example, Corey,

10   for what you could be if you work hard and you go to

11   school.  And I ruined that.  I blew that.

12        I also want to note -- I also want you to know,

13   Judge, that I was an officer of the Court.  I first met

14   you when I was in Bridgeport on an employment case.  My

15   client had died, and we lost summary judgment motion.  And

16   I remember you came down and shook our hands.  It was a

17   proud moment because it was my first time in federal court

18   by myself without the big firm.

19        And as an officer of the Court, I let the client

20   tell me what we could and couldn't do, and it was my job

21   to tell them what we could and couldn't do.  And I didn't

22   do that.  I was the gatekeeper.  I felt indebted to

23   Christian Meissenn because he first was bringing me -- he

24   would bring me business, unrelated securities stuff.  And

25   I was starting my practice.  And the Court knows why I got

 1    into securities.  At that time I was doing a bunch of

 2    things I didn't know about: education, zoning.  I was

 3    trying to learn as I was going, because if somebody had a

 4    matter they needed help, I needed the business.  And so he

 5    came to me with securities.  I figured, okay, I would

 6    learn this and it could be a new area of practice.  And I

 7    shouldn't have done that because I didn't know enough

 8    about it.  And I made a mistake.  And I caused these

 9    people pain.

10          But I don't want -- I just want the people to

11    know that I know what it's like not to have money.  My

12    mom's sitting behind me.  I remember her crying when she

13    was laid off in the insurance industry in '90s.  I

14    remember the tears when she finally got a job.  I remember

15    calling her up when I was a kid and telling her that the

16    lights were off and hearing her cry because she couldn't

17    afford to keep the lights on as a single mom after my dad

18    died.  I remember having to drop out of college because I

19    couldn't afford to keep going.  So I want the people in

20    the room to know I would never intentionally put somebody

21    else in that position.  I took the long way to get to

22    where I was because of delayed gratification.  And so I

23    wouldn't -- I would never knowingly just put these people

24    like to lose all their life savings and all their hard

25    work, that's not who I am.

1            In hindsight, I wish I had done more to figure

2   this whole thing out.  The reality is just I was busy

3   running my practice, I had a lot of clients, I was trying

4   cases.  And instead of investigating -- and I wish I had

5   talked to these people more about the issues that they

6   were going through and I wish I had stopped this.  I could

7   have stopped this and I was on the front lines and I

8   didn't.  And I understand, because I made those mistakes,

9   that you have to punish me.  And that's why I want to come

10  here and accept responsibility.

11           I don't expect everybody here to forgive me,

12  Your Honor.  But I want the community, the people who lost

13  money, they're real people, my family, my mother, my

14  fiancée, to know that I'm sorry.  But through making a

15  mistake, I could make it a teaching lesson not only for

16  people in the community that no matter how far you get to

17  in life, you have to continue to make the right choices.

18  And if you don't make the right choices, there's a

19  consequence to pay for a mistake.  And for every young

20  solo practitioner, that I want them to learn and

21  understand you may never wake up and find yourself in the

22  middle of a multi-million dollar stock fraud, but if you

23  make the wrong choices, you could end up there.  I think

24  there's lessons to be learned.  I don't want this to be my

25  defining moment.  I'm 37.  I have a lot of life to live,

1    Your Honor.

2          I promise the Court I will never do anything

3    like this ever again.  I've been humbled.  I've learned.

4    I'm sorry.  You know, I go to Capital Workforce because I

5    didn't want to sit home and just watch daytime talk shows;

6    I wanted to get up and be productive.  I was used to being

7    busy, and that was taken from me.  So I just want to

8    continue to give back.  I don't have to be a lawyer to

9    serve my community.  I'm going to continue to do that.

10   And I really want the Court to know I'll never do

11   something like this again.  I'm truly, truly sorry.  And

12   especially to the people that are in this room today, I'm

13   sorry.

14         Thank you.

15         THE COURT:  Thank you, Mr. Brinson.

16         I'm trying to understand, when you signed off on

17   the securities letters, that they have very specific

18   factual representations there about what you did.  And

19   it's my understanding that you didn't do any of those,

20   right?  You signed letters saying you'd done certain due

21   diligence and you didn't do it, right?

22         THE DEFENDANT:  So it didn't start that way.  So

23   the first letters I got, I got some annual reports from

24   Mr. Lieberman.  And then I was trying to do them based on

25   those reports.  And one of the exhibits the government

1     attaches, Mr. Lieberman is saying this is all wrong.

2     Because I'm trying to do it right.  But I'm the one doing

3     it.  Which is why I shouldn't have been doing it.  So then

4     I just defaulted to him, he said, "I'll fix it.  I'll do

5     it."  That's when I should have said no.  But I didn't.

6     And that was wrong.  But it didn't start like we need to

7     commit a fraud, can you help us.  But by letting them --

8     it was my letterhead, my name on it.  And I let them tell

9     me what should go in it.  And that was wrong.

10              THE COURT:  At some point you decide to also

11    take all this money in through your trust fund account.

12    What's your thinking at that point when you -- was it you

13    who proposed the 5 percent or is it Mr. Meissenn?

14              THE DEFENDANT:  Mr. Meissenn proposed it.

15              THE COURT:  So you weren't really doing anything

16    for that money, right?

17              THE DEFENDANT:  I was, Your Honor.

18              THE COURT:  You were?  What were you doing?

19              THE DEFENDANT:  Yes, Your Honor.  I was doing

20    several things.  I represented Mr. Meissenn -- first, I

21    didn't meet him doing securities.  I met him doing zoning.

22              THE COURT:  You had the Bloomfield --

23              THE DEFENDANT:  Correct.  And I also did some

24    zoning work for him in Suffield.  And also did some

25    landlord/tenant representation for him and also civil

1    litigation in state court based on his Bloomfield

2    property.

3              And so in addition to sending out the checks and

4    the wires as to the other companies, I also did other

5    legal work included in that fee because when I got

6    involved with this, it wasn't like we're doing a fraud.  I

7    learned later that he was barred from the securities

8    industry.  I didn't know that on the first day.  When I

9    took the first money in, I didn't know I wasn't supposed

10   to be taking that first money in.  Later on I learned that

11   he wasn't supposed to be doing securities.  But at that

12   point I felt indebted to him because he had helped me in

13   my career at that point.  And I didn't think any of these

14   people were losing any money.  So I continued.  That was

15   my other mistake.

16             THE COURT:  So when you learned that he's barred

17   in the securities industry, I know you say that you don't

18   know the date that you learned or realized that, did you

19   undertake any further inquiry to figure out why he was

20   barred from the securities industry?

21             THE DEFENDANT:  I did not, Your Honor.

22             THE COURT:  Did it occur to you that maybe he's

23   barred because he's a crook or he had been a shyster or

24   that he had defrauded other investors?

25             THE DEFENDANT:  I did not, Your Honor.  I did

 1    not.

 2              THE COURT:  When you had the money, the

 3    3 million plus going through or actually more than

 4    4 million, but the 3 million that you've agreed as part of

 5    your plea agreement that you knew that was the proceeds of

 6    fraud, right?

 7              THE DEFENDANT:  I knew that money was coming

 8    from people, yes, Your Honor.

 9              THE COURT:  You knew it was the proceeds of

10    fraud, didn't you?  Didn't you agree to that in your plea

11    agreement?

12              THE DEFENDANT:  Yes, it was a fraud.

13              THE COURT:  I know you didn't know the full

14    scope of the pump and dump.

15              THE DEFENDANT:  Fraud because Mr. Meissenn was

16    directing these sales and he shouldn't have been.

17              THE COURT:  But fraud that they were supported

18    in part by these attorney opinion letters of yours, right,

19    that were themselves fraudulent because they vouched that

20    you were doing certain things that you hadn't done, right?

21              THE DEFENDANT:  That is correct.

22              THE COURT:  So when you got the 5 percent, was

23    that money coming straight out of the attorney trust fund

24    account?

25              THE DEFENDANT:  It was.

1          THE COURT:  So I hear you saying, well, you were

2   doing other services, legal services for him.

3          THE DEFENDANT:  Correct.

4          THE COURT:  I don't have any kind of

5   documentation of what that was.  Is there documentation,

6   additional documentation?  Did you ever write up an

7   invoice and say, well, this is the project I did on

8   such-and-such date and such-and-such address, and here is

9   the charge?

10          THE DEFENDANT:  I provided to my attorney a list

11   of legal projects that I worked on for Christian Meissenn.

12   Because -- the reason why I agreed to do the legitimate

13   legal work for 5 percent, because when I was just writing

14   checks and wires, to me it was like, well, this is --

15   that's not a lot of work to do the checks and wires.  So

16   when he had these other additional legal, I told him I'm

17   not going to charge you extra for it because I was, like,

18   I'm just doing these checks and wires.  So it felt unfair

19   to me to charge him additional, if that makes sense.

20          MR. MURPHY:  If I may, to answer Your Honor's

21   question, I don't believe there are separate invoices for

22   that aspect.

23          THE COURT:  It doesn't sound like there were

24   separate invoices.  And I see the sort of mental

25   calculation that you're saying that you sort of thought

1    they kind of evened out?

2           THE DEFENDANT:  Right, right.

3           THE COURT:  Now, a lot of that money that's

4    coming in is from Mr. Phillips or other victims, at least

5    49 of them, right?  These are third parties sending money

6    in to your trust fund account, have nothing to do with the

7    zoning or other work that you're doing, right?

8           THE DEFENDANT:  Right.

9           THE COURT:  And then you're taking money --

10   basically you're taking their money, victims' money,

11   right?  You're taking 5 percent from their money, right?

12          THE DEFENDANT:  That's correct, Your Honor.  Can

13   I tell you how I looked at it?  I'm trying to be honest.

14   Because I've dealt with this with my lawyer and the

15   government, I understand people have trouble believing me,

16   but I'm just being honest with you as a former officer of

17   the Court.  It was Christian Meissenn paying me to do the

18   things he asked.  So, yes, it was their money, but because

19   I had direct access to it.  If I didn't, he wouldn't have

20   been paying me that money.  So I was taking my fee from

21   Christian Meissenn for the work that I was performing for

22   him which included sending out the money and doing other

23   legal projects.

24          THE COURT:  But still, when the money -- I want

25   to understand what you thought was happening.  So say a

1  check for $25,000 comes in, you take your 5 percent.  Then

2  that money is going on.  You're sending it off to entities

3  and the like at Mr. Meissenn's direction or somebody,

4  Mr. Lieberman --

5          THE DEFENDANT:  Mr. Meissenn always.

6          THE COURT:  Aren't you aware at that point that

7  that's 5 percent less of one of the victims' money that is

8  being actually invested?

9          THE DEFENDANT:  Yes.  So I assumed --

10         THE COURT:  You assumed that Mr. Meissenn was

11 reimbursing the victim at some later point?

12         THE DEFENDANT:  No.  So I assumed that, for

13 example, on a $20,000 check comes from, that there was

14 some profit or management fee for being the one that got

15 the money comes in, and then the rest went off to some

16 company.  So he had me send it to So-and-So company.  Most

17 of these companies were in New York.  And I forwarded the

18 money to the company that he asked me to send it to.  I

19 assumed there was some profit built in to the monies that

20 came in.

21         THE COURT:  So you were taking a portion of the

22 amount that Meissenn, as the investor, or the Meissenn

23 company could have lawfully taken, that was your

24 assumption?

25         THE DEFENDANT:  Right.  That there was some

1    profit built in, correct.  Right, correct, that there was

2    some profit built in to that money as the person who was

3    responsible for getting the money in and then the rest is

4    going on to the company.

5          THE COURT:  All right.  So if you don't -- help

6    me understand a bit what your vision is if you're not able

7    to go back to the practice of law.  You know it's very

8    difficult to get back to the practice of law in

9    circumstances like you're in.

10          THE DEFENDANT:  Yes.

11          THE COURT:  Tell me what your vision is in terms

12    of what you would do.

13          THE DEFENDANT:  So all my life I've been a

14    planner.  That's how I got to where I was.  So my plan,

15    Judge, is to do a couple things.  One, I could help people

16    with pardons.  Mark Dubois tells me I don't have to be an

17    attorney to help people with pardons.  I could continue to

18    do that after my suspension.  And I'm from a neighborhood

19    where there's no -- there's plenty of people who need

20    pardons.  And so that's something that I instantly thought

21    that I've done it before and I've gotten people awarded

22    pardons.  So I would like to do that.

23          The other thing I would like to do, Your Honor,

24    is get into -- maybe start like a marketing firm.  I had

25    to market my law firm on the radio, newspaper, things like

1    that.  So I was thinking I could help small business

2    owners market their businesses to the community because I

3    had to do that for several years.  I have some skill set

4    from running the business outside of law that I'm hoping

5    that I can use to generate income to pay back what I can

6    to these people.

7            THE COURT:  I'm going to impose certainly a

8    restitution order.  It's going to be very stringent

9    restitution order.  Are you committed to complying with

10   that order?

11           THE DEFENDANT:  Yes, Your Honor.  I'll do any

12   and everything that the Court asks of me.  I know the most

13   important thing that I want to do is to give back every

14   nickel that I got out of this that I shouldn't have

15   received.  That's important to me.  And I've talked to my

16   fiancé that there's going to be things that we're not

17   going to be able to do so I can make these people whole,

18   Your Honor.

19           THE COURT:  Okay.  Is there anything else you

20   want me to know, sir?

21           THE DEFENDANT:  Just that I'm -- that even

22   though people have called this case sad, that I want the

23   sadness to be for the people sitting in the gallery today

24   who have lost their life savings, particularly the older

25   people, because while I'm still young, I have a lot of

1    life ahead of me, some of these people don't.  My sadness

2    today is with them.

3             And I'm really sorry that I got involved with

4    Christian Meissenn.  Obviously I wish I never met him.

5    I'm sure they do too, Your Honor.  And I apologize.  It's

6    sincere, Your Honor.  And I'd like to be able to do

7    everything that I can to make this right.  There's more to

8    my story than today.

9             THE COURT:  Thank you.  And that's very true.

10   Your counsel, Mr. Murphy, has very capably made a case on

11   your behalf and urged me to look at you as a whole person.

12   I do do that, and I realize the many good and positive

13   things I've heard about your family and I've seen

14   reflected in the so many supporters that you have.

15            THE DEFENDANT:  Thank you.  Thank you.

16            THE COURT:  Thank you, sir.

17            MR. MURPHY:  Your Honor, I don't know if you

18   wanted to ask me questions.

19            THE COURT:  I have a few factual questions.  It

20   may be something you want to respond to now or it may be

21   something the government may want to elaborate on.  It's

22   part of what appears in the government's memo.

23            Three factual areas.  Government Exhibit 15,

24   which the government cites for purposes of suggesting that

25   Mr. Brinson had I think subscribed or supported the

1    forging of certain names.  I'd like to learn a little bit

2    more about what that is.  And the government also talks

3    about cash withdrawals of approximately $519,000 that were

4    taken from the trust fund account and given to

5    Mr. Meissenn, as I understand it.  I'll be interested to

6    hear what the response to that is.  And there's also

7    mentioned in the government's memorandum about the $22,000

8    that was taken to a company that was co-owned by

9    Mr. Brinson and Mr. Meissenn, and I'd be interested to

10   know a little bit more about what that business venture

11   was.  And it may be something that you choose to address

12   now or if you wish to have the government elaborate upon

13   that because they're the ones who raised this in the

14   memorandum and then you respond, you certainly have that

15   opportunity.  I just wanted to let you know.

16            MR. MURPHY:  Maybe it would be better to hear

17   what the government has to say first and we'll respond.

18            THE COURT:  Hold on just a second.

19            Please proceed.  Just checking with our court

20   reporter.

21            MR. PERRY:  Please proceed or please be seated?

22            THE COURT:  Please proceed.

23            MR. PERRY:  It would not be the first time I

24   confused those two comments.

25            I want to begin, Your Honor, by recognizing the

1    many good and caring supporters who wrote letters and

2    spoke from the heart on Mr. Brinson's behalf.  I think

3    it's clear, and I acknowledged as much in my sentencing

4    memorandum, that he's done much good in his life, both at

5    the service of his country and for the service of his

6    community.

7         This is a hard sentencing.  Many sentencings are

8    difficult.  This one, at least from my perspective, is

9    especially so because there really are two sides to this

10   story.  My comments today as well as my comments in the

11   sentencing memorandum are not meant to denigrate the many

12   positive things that Mr. Brinson has done in his lifetime.

13   At the same time, it's my job to remind the Court of what

14   it is that brings us here today.

15        We heard from Attorney Dubois that there are

16   victims all around in this case.  And with great respect,

17   that isn't so.  There are victims sitting over there and

18   over there and over there (indicating).  They're victims

19   who submitted letters.  They're victims who lost

20   retirement savings.  They're victims that lost money they

21   needed for their business, for their children and their

22   grandchildren.  Mr. Brinson is not a victim.  He was not

23   hoodwinked by Mr. Meissenn.  He was a knowing participant

24   for nearly six years in a scheme to defraud investors.

25        He says now that it was a scheme to defraud

1    Mr. Meissenn's creditors and a scheme to defraud

2    securities regulators.  But the plea agreement and the PSR

3    both say it's a scheme to defraud investors.  That's

4    because it was.  He may not have known the term "pump and

5    dump."  He may not have known -- and I think he did not

6    know the extent of the fraudulent representations being

7    made to investors.  But he surely knew, or was willfully

8    blind to the fact, that this was a scheme to defraud

9    investors.

10          I have enumerated the facts that I think support

11   that conclusion in my sentencing memorandum.  I won't

12   belabor them today, Your Honor, but he cannot on the one

13   hand know that Mr. Meissenn is barred from the industry,

14   that Mr. Meissenn is hiding his assets from creditors,

15   from the IRS, that Mr. Meissenn is hiding his involvement

16   in securities sales from the industry, that his trust

17   account is being used as a pass-through, that he is taking

18   5 percent of investor funds, that the opinion letters

19   bearing his name and signature are false in so far as he

20   did none of the due diligence described in those letters.

21   He cannot know all of those facts and then be shocked to

22   learn at some point that investors were being deceived and

23   were being hurt.

24          There's been a lot of discussion today about how

25   this might have been avoided and what Mr. Brinson might

1    have done differently.  There is no question that he had

2    distinguished mentors to consult.  He could have educated

3    himself on securities law.  He could have referred

4    Mr. Meissenn to some other lawyer for his securities

5    needs.  He didn't do any of those things.  He's

6    acknowledged that that was wrong.

7            But I want to shed some light on why that is and

8    I think it's very simple.  He was struggling to get his

9    practice off the ground.  Mr. Meissenn drove fancy cars,

10   lived in a nice home.  Mr. Brinson wanted those same

11   things.  Certainly coming from his background, I don't

12   begrudge him a desire for success.  But there is no doubt

13   in my mind that he knew from the outset that the way that

14   he went about that was absolutely wrong.

15           We heard stories today about when he was in high

16   school and in law school, his first day interviewing for a

17   position at a firm that was then Day Berry.  This didn't

18   happen any of those times.  This didn't happen when he

19   didn't know what parking validation was.  This happened

20   when he was driving a Bentley and he surely knew what

21   parking validation was.  He wasn't fresh out of law

22   school; he was five years out of law school.  He was not

23   so inexperienced or so naive that he didn't know this was

24   wrong from the get-go.  And surely, Your Honor, as years

25   went on into early 2014 when he says he realized that

1    investors were relying on these fraudulent opinion letters

2    that he stops it, he surely knew at that point that

3    investors were being defrauded.  And yet he continued on

4    as the scheme's banker for another two years.  So he knew.

5          He was busy with other matters.  He was putting

6    together a thriving criminal defense practice, other areas

7    of specialty.  And so he didn't take the time or show the

8    interest in asking the questions that would have made

9    abundantly clear exactly what the scheme was.  There's no

10   dispute that he didn't have actual knowledge of the full

11   extend of the scheme.  But this is a textbook example of

12   willful blindness.

13         There are many serious consequences to this case

14   for Mr. Brinson personally, for the victims.  Your Honor

15   heard from the victims and read in their accounts and

16   their statements more powerfully than I could describe

17   exactly what the effect of this case has been.

18         What upsets me tremendously today is not the

19   money that they've spent -- that they've lost, excuse me,

20   that was stolen from them, or the aggravation and

21   heartache that they've been through, but the fact that to

22   this day some of them blame themselves.  That's not right.

23   This is not their fault.  They were deceived.  And even

24   those of them, and you heard from two individuals today

25   who attempted to do due diligence, who Googled

1   Mr. Brinson, who went to his web site, who saw that he

2   touted himself as a reputable, trustworthy member of the

3   bar who was civically engaged, who'd served with

4   distinction in the military, even those people who did

5   their best to do due diligence were deceived.

6          You know, we sitting here sometimes have a

7   jaundiced view of attorneys because, by virtue of what we

8   do, we sometimes see -- certainly see excellent, excellent

9   attorneys.  We also see, and Your Honor has sentenced,

10  attorneys who have dishonored the bar and committed

11  criminal conduct.  But I think for many, many people, the

12  imprimatur of an attorney and attorney's association is a

13  hallmark of trustworthiness.  For many of the people who

14  lost money as a result of the scheme, knowing that

15  Mr. Brinson was involved, sending money to his trust

16  account, seeing his name on opinion letters, on share

17  purchase agreements, that made them trust, that made them

18  believe that this was a reputable enterprise.  And so they

19  were more willing to send in their money.  I don't have to

20  tell Your Honor that, you've heard them.

21          I want to speak a little bit about Mr. Brinson's

22  role in the scheme and his relative culpability.  This is

23  the outset of what I expect will be a series of related

24  cases.  Your Honor is aware that one defendant, you've

25  heard his name many times, Christian Meissenn has already

1    pleaded guilty, he's awaiting sentencing.  I think

2    Your Honor may be aware that there are two other

3    individuals in related cases that have indicated that they

4    wish to plead guilty; those cases are not public.  Your

5    Honor certainly heard today about a number of individuals

6    and names.

7           Mr. Meissenn and another individual who hasn't

8    yet been charged ran the scheme.  They set up the shell

9    companies.  They orchestrated the promotions.  They made

10   sure that all the insiders and salesmen got paid.  Below

11   them was a group of paid salesmen, Your Honor has heard

12   about several of these individuals.  It was the salesmen

13   who pitched these stocks to prospective investors.  They

14   would call them up, they would send out mailers, they

15   would follow up with e-mail.  The scheme also included

16   other attorneys who, like Mr. Brinson, signed fraudulent

17   opinion letters, laundered money through other IOLTAs and

18   otherwise facilitated the scheme through the misuse of

19   their law licenses.  Finally, there were brokers, transfer

20   agents, market bankers who were complicit and facilitated

21   the success of the scheme.

22          There's no question Mr. Brinson is less culpable

23   than Mr. Meissenn, is less culpable I believe than the

24   other principal of the scheme, the other organizer.  I

25   think in important ways he's even less culpable than the

1    salesmen, although it's a smaller margin.  He profited

2    less than the salesmen did.  He didn't directly solicit

3    investors and therefore he didn't lie directly to them,

4    although certainly he did through the fraudulent opinion

5    letters.  I think it probably takes a different kind of

6    person to speak directly to an investor, you know their

7    age, you know their financial circumstances, and to lie

8    directly to that person than to do what Mr. Brinson did.

9    I think it takes a different kind of person.  So on

10   balance, I do think that Mr. Brinson was less culpable

11   than those other participants in the scheme.

12          There is, of course, a way in which he was more

13   culpable.  And this is part of why we're sort of comparing

14   apples to oranges.  And that's because, as an attorney

15   with his training and his experience, he absolutely should

16   have known better.

17          We've heard a lot today about how

18   unsophisticated he was, how he didn't have any financial

19   pedigree, how he really didn't have any business in these

20   securities transactions.  I agree with the last of those

21   propositions.  He didn't have any business doing this.

22   But this was a graduate of UConn Law School and actually

23   quite a successful one, as we've heard today from Attorney

24   Dubois, who had very good oral advocacy skills, who

25   impressed his professors and classmates alike, who secured

1  a coveted spot at a very prominent firm in Connecticut and

2  who practiced successfully as an attorney for five years.

3  He served with distinction in the military.  This is not

4  some babe in the woods who was just in over his head.  He

5  knew what he was doing.  The opinion letters, as you look

6  at them, these are not 200-page-long prospectuses or

7  something like that.  These are very short documents,

8  three, four, five pages, that he was being asked to sign

9  his name to or allow someone else to sign his name that

10  are clearly false, because he knows that he didn't do what

11  they represent him to have done.

12         We talked -- Your Honor spoke with Mr. Brinson

13  and Attorney Murphy about the money passing through the

14  IOLTA.  It is wrong to suggest -- let me back up.

15         The government's evidence is not that

16  Mr. Meissenn suggested the 5 percent.  The government's

17  evidence is that that number was chosen by Mr. Brinson.

18  There was some period where it was less than 5 percent,

19  some period where there was some discussion of more.  Sort

20  of settled on 5 percent.  Perhaps by consensus.  But it's

21  wrong to suggest that the $200,000 that Mr. Brinson got

22  somehow was, even in his mind, fair payment for the work

23  that he had done for Mr. Meissenn.  He did a minimal

24  amount of unrelated work for Mr. Meissenn.  Even in the

25  defense's own sentencing memorandum, I'm looking here at

1   Footnote 5 on page 13, he valued those services at

2   $50,000.  So even by his calculation, which I think is

3   generous, there's $150,000 deficit there where he's

4   receiving those fees for doing absolutely no work.  He has

5   to know that that is wrong.  He has to know when investors

6   were calling two or three times where are my share

7   certificates, where are my share certificates, that that

8   was wrong.

9           One of the exhibits attached to my sentencing

10  memorandum I think is very telling as to his response,

11  which is this gentleman, one of the gentlemen here today,

12  has called three times.  "I thought we had resolved this

13  issue.  But it's my name out there.  And you need to take

14  care of this."  And I think he says, "This isn't my

15  problem nor did I cause it.  Nor can I solve it."  And

16  that was his attitude.  It's I'm going to do my practice,

17  I'm going to defend my clients.  And everything else the

18  rest of you are doing, I don't want to know about it;

19  that's not my problem.  What happens to these investors is

20  not my problem, even though their money is going to me,

21  even though my name is on the opinion letters, even though

22  they're sending in their money in reliance on my position

23  as an attorney and an officer of the court.  I don't want

24  to know about it, it's not my problem.  That is the

25  definition of willful blindness.

1          As to what sentence is appropriate --

2          THE COURT:  Before you get there, I would

3   appreciate hearing -- you heard me raise the concerns, the

4   issues about Exhibit 15 and the cash withdrawals and the

5   $22,000 to the co-owned company.

6          MR. PERRY:  Exhibit 15, Your Honor -- and all

7   that's been redacted here is the e-mail address of Billy

8   Lieberman.  I agree with Your Honor that it doesn't quite

9   speak for itself and it raises valid questions.  The way

10  that the government interprets this document is that

11  Mr. Lieberman is asking Mr. Brinson to forward on an

12  e-mail that Mr. Lieberman has written to a transfer agent

13  in order to execute securities transactions that involve

14  insiders, specifically KittiHawk.  That was a shell

15  company associated with Mr. Meissenn and with certain

16  other individuals.  The share transfers were coming from

17  these other accounts, Gras Direct, Eco Plan, that frankly

18  do not appear to be associated with insiders, but it's not

19  clear to the government, our investigation has not

20  revealed exactly who the beneficial owners of those

21  accounts are without knowing the brokerages where they're

22  held.  There really is virtually no way for us to figure

23  that out, especially since the participants in this scheme

24  quite clearly took steps to hide that information.  So I

25  really can't tell you who Gras Direct and Eco Plan are,

1   but I do know the transfers are to companies associated

2   with the insiders in this scheme.

3           Mr. Brinson appears -- it appears Mr. Lieberman

4   is asking Mr. Brinson to scribble or to forge the names of

5   the beneficial owners of Gras Direct and Eco Plan, whoever

6   they might be, in order to facilitate this insider

7   transaction.

8           THE COURT:  Just a moment.  I want to make clear

9   so the record is clear here, this e-mail, Exhibit 15, it's

10  an e-mail from Mr. Lieberman to Mr. Brinson saying "You or

11  someone needs to sign all of these for the owner of these

12  accounts.  You can probably just scribble, but ask Chris."

13  That's Mr. Meissenn, I assume?

14          MR. PERRY:  Yes, Your Honor.

15          THE COURT:  And it says, "I do not know who the

16  beneficial owner of this brokerage firm is.  Just confirm

17  and sign them."  Then there was a response from

18  Mr. Brinson actually two minutes later after getting this

19  e-mail, simply says, "Got it."  Is that right?

20          MR. PERRY:  Yes, Your Honor.

21          THE COURT:  And is there more about this?  Did

22  in fact this happen, were these signatures scribbled?

23          MR. PERRY:  I don't know the answer to that.

24  And I also don't know, and this may be as frustrating to

25  Your Honor as it was to me, whether this was an isolated

1    incident.  I will tell you that the paper records,

2    including e-mails, in this case are thin.  That I think

3    appears to have been perhaps intentionally so.

4    Mr. Meissenn, for instance, never used e-mail or rarely

5    used e-mail, and certainly not his own name.  So it's

6    sometimes hard --

7              THE COURT:  But do you know, for instance,

8    there's a proposed e-mail by Lieberman to Shavonne,

9    somebody named Shavonne.  Did that e-mail ever get sent,

10   do you know?

11             MR. PERRY:  So the e-mail would have gone out

12   from Mr. Brinson to this person Shavonne.  I don't know

13   whether it went out.  We never did a search warrant for

14   Mr. Brinson.  There were such attorney-client privilege

15   issues there, frankly, Your Honor, to do a search warrant

16   for his e-mails would have been --

17             THE COURT:  So you just don't know.

18             MR. PERRY:  I don't know the answer.  I don't

19   know the answer.

20             THE COURT:  Okay.

21             MR. PERRY:  I know what the request was.  I

22   certainly understand "got it" to mean I understand what

23   you're asking me to do if not an acquiescence to do it.

24   But I don't know whether the e-mail was actually sent.  It

25   could be just a confirmation of receipt.

1          But certainly it shows that he was aware that

2    someone else in the scheme was asking him to do this

3    obvious illegal thing.  That someone else that he was

4    affiliated with, that he interacted with many, many times,

5    and Your Honor has seen that, was asking him to do this

6    thing that should have raised a red flag immediately.

7    Whether or not he did it, to continue associating with

8    these kind of people, and this was 2012, for another four

9    years suggests that he absolutely knew or should have

10   known that these were people who were comfortable doing

11   illegal things, whether or not he ultimately sent the

12   e-mail.

13          Your Honor asked about $22,000 to a company

14   co-owned by Mr. Meissenn and Mr. Brinson, company called

15   Classic Vehicle LLC.  Mr. Meissenn and Mr. Brinson shared

16   an affinity for luxury automobiles.  Mr. Brinson drove

17   over time a Mercedes and a Bentley, I believe both of

18   those were leased, sort of to cultivate an appearance of,

19   flash the trappings of success if not the real thing.

20   Mr. Meissenn similarly I think had a Bentley and several

21   other cars.  Those were housed in a warehouse in

22   Connecticut.  There was I think this aspiration to have

23   this joint business venture together involving I think the

24   refinishing of luxury automobiles.

25          THE COURT:  So there was 22,000 taken from the

1    trust fund account, investor money that was sent to a

2    company co-owned by Mr. Meissenn and Mr. Brinson?

3              MR. PERRY:  Yes, Your Honor.  It was two $11,000

4    transfers for a total of 22,000.

5              THE COURT:  And the company was basically a

6    luxury car entity?

7              MR. PERRY:  Yes, Your Honor.

8              THE COURT:  And then the other item was the cash

9    withdrawals of about $519,000.

10             MR. PERRY:  Right.  So over the years, I believe

11   in roughly 200 separate transactions there were cash

12   withdrawals out of the IOLTA, which already should have

13   never happened, totaling approximately $519,000.  The

14   government's evidence suggests that some percentage of

15   that may have gone to Mr. Brinson.  But the overwhelming

16   majority of that money was part of the proceeds that

17   flowed to Mr. Meissenn.  And again, it would all be

18   investor money that came into the account from investors

19   and withdrawn by Mr. Brinson.  He was the only signatory

20   on the account; it was his IOLTA.  So he's the one that

21   actually has to go up to the teller and withdraw the

22   money.

23             THE COURT:  Are they ATM transactions?

24             MR. PERRY:  They're not ATM transactions.  I

25   don't think you can have a debit card with an IOLTA.

1    These are all -- because there shouldn't be cash, right?

2              THE COURT:  Somebody going into the bank?

3              MR. PERRY:  Mr. Brinson going into the bank and

4    withdrawing the cash and giving it or substantially all of

5    it, giving it to Mr. Meissenn.

6              THE COURT:  Is that pretty much evenly spaced

7    out over the roughly six-year period?

8              MR. PERRY:  I really don't know the answer as I

9    stand here right now.  I know the total and total number

10   of transactions, but as to whether there were more in

11   2011, 2015, I just can't say.

12             I will tell you not a one of the cash

13   withdrawals was over $10,000, which suggests the

14   possibility of structuring.  Now, the request may have

15   come to Mr. Meissenn, take me out $9,000, take me out

16   $5,000.  I'm not imputing that to Mr. Brinson's notion.

17   But certainly I think it is noteworthy that none of the

18   transactions were over the $10,000 CTR filing threshold,

19   currency transaction report.

20             THE COURT:  Let me ask you a little bit, this is

21   something that's in your memorandum as well about the rap

22   video, the Team Grease rap video.

23             MR. PERRY:  Yes, Your Honor.

24             THE COURT:  And I'd be interested in hearing

25   from you what significance you think that should have for

1    the Court for sentencing purposes.  I understand the

2    Court, by statute I'm allowed to consider any kind of

3    information.  There's no limitation on what the Court can

4    consider, and I appreciate the government calling to my

5    attention information.  On the other hand, having looked

6    at the video, I have a concern that essentially it's a

7    type of art form.  And it's not produced in the first

8    place by Mr. Brinson.  Mr. Brinson plays in that obviously

9    not a very flattering role in that video, but it does

10   seem -- I have a concern essentially about, frankly, about

11   First Amendment values and about basing part of the

12   sentence, if the government's asking me to do that, on

13   essentially an assessment of Mr. Brinson's participation

14   in what seems to me to be protected speech type of

15   activity or protected artistic expression.  Whether or not

16   one agrees with it, that's the whole idea of art, is

17   whether one thinks it's in good taste or not.  Is there

18   something that you're asking the Court to draw, other than

19   the fact, as Mr. Brinson just told me a while ago, he has

20   people that he's known and grown up with and actually some

21   of them appeared before me for sentencing in another case

22   that Mr. Jongbloed has handled, is there something else

23   you want me to -- because my inclination is essentially

24   not to put any significance on that video.

25              MR. PERRY:  I understand my obligation to the

1    Court to present information the Court may find relevant

2    and for you give it whatever value you see fit.  If you

3    assign it no value --

4              THE COURT:  Tell me if there's some reason I

5    should.

6              MR. PERRY:  Here's why -- I should say from the

7    outset, there's no question it is an artistic expression.

8    I don't think it depicts real life events.  The Court

9    should know that.  I have no evidence there was a similar

10   incident in real life where Mr. Brinson handed over 302s

11   or a 5K or something so that other people could then act

12   on.  I think this is art.

13             I think it is relevant, though, Your Honor, to

14   some of the sentencing factors.  And I'm thinking

15   specifically of the history and characteristics of the

16   defendant.  I think it is probative of his prior displays

17   of poor judgment.  And I think it shows another instance

18   where he crossed a line with a client, I'm thinking of the

19   individual identified as Jimel Frank whom Mr. Brinson has

20   represented in the past.  I think it shows a willingness

21   to exploit and misuse the trappings of his profession.

22   There's a close-up shot of his UConn Law School degree,

23   it's in his office.  So I do think it shows another

24   instance of poor judgment.  As I say, boundary issues with

25   clients such as Mr. Meissenn, a willingness to blur those

1   lines between someone that should be a client and somebody

2   that should be a friend.  And I understand that sometimes

3   those lines are blurred.  But as an attorney, it is your

4   obligation to demarcate the lines clearly.

5          Primarily, Your Honor, I included the video in

6   response to the notion in the defendant's sentencing

7   memorandum that he was guileless, that other than this

8   six-year long foray into criminality he has lived a

9   blameless life and otherwise shown very good judgment.  I

10  wanted the Court to be aware there was at least this very

11  prominent example of him displaying very poor judgment in

12  ways that are certainly less egregious and not at all

13  criminal like the conduct here, but that shows some of the

14  same traits that got Mr. Brinson in trouble here in the

15  first instance.

16         I don't want to make too much of the video,

17  Judge.  It speaks for itself.  And if you assign it no

18  probative weight, that's certainly fine.  He should not

19  receive a sentence that he otherwise would not have gotten

20  because of his video.  I think it's bad enough that he

21  knowingly engaged in a scheme to defraud for six years

22  involving millions of dollars and got $200,000.  I don't

23  know that -- if Your Honor is inclined not to rely on the

24  video, I think that's fine.  I wanted to bring it to your

25  attention.  As I said, I think it's appropriate.  But I

1   don't want to make too much of it.

2          THE COURT:  For the sake of the record, I'm not

3   faulting the government for bringing it to the Court's

4   attention, but I'm not relying on that video or drawing

5   any kind of inference from that video.

6          MR. PERRY:  Very well.  Thank you, Your Honor.

7          I realize I'm going on at length here.  I just

8   want to end by talking about the framework for what an

9   appropriate sentence would be from the government's

10  perspective.  I do this with full deference to Your Honor.

11         The guidelines are too high in this case.  I

12  think that for a number of reasons.  Mr. Brinson does have

13  extensive history of community service, community

14  involvement.  He has his record of military service.  And

15  as I say, I think he, more so than many defendants, has

16  taken the right steps into learning about the government's

17  investigation.  Frankly, he's impressed me in that

18  respect, including when the initial plea hearing was put

19  off for some time and the terms, from his perspective, I

20  imagine, got worse.  He continued to express a willingness

21  to accept responsibility.  I credit him for that.  I think

22  he should receive credit in the form of a lower sentence

23  for all of those factors.

24         If you look at the gain numbers, 27 to 33

25  months, I think that is another metric that the Court

1    should consider.  But I don't think that gain is a perfect

2    proxy for culpability in this case.  That's so because the

3    degree of victim impact is so exceptionally high here.

4    And the duration of the scheme, nearly six years, is

5    exceptionally long.  This is not a momentary lapse in

6    judgment.  This is not a one-off crime.  This is a daily

7    pattern of misconduct involving hundreds of separate

8    tractions and tens of opinion letters.

9           Finally, of course, I think the gain is a poor

10   proxy for culpability because the defendant's misuse of

11   his law license and the associated tools and trappings of

12   a lawyer was so egregious here.  So I think that the gain

13   number, that 27 to 33 range, is a bit low.

14          The government is seeking a period -- a

15   substantial period of imprisonment.  A year and a day just

16   doesn't go far enough to reflect the gravity of the events

17   here, the victim impact, the money involved.  And

18   similarly, I think gain is slightly too low.

19          So with respect, of course, to Your Honor, the

20   government's submits a sentence somewhere between the top

21   of that gain range and the lower end of the guideline

22   range would serve the ends of justice here and accomplish

23   the goals of sentencing.

24          THE COURT:  Thank you.

25          MR. PERRY:  Thank you for your time, Your Honor.

1          THE COURT:  We'll take a break.  We've been

2     going strong, so why don't we take 20 minutes for our

3     court reporter.  Thank you.

4               (Whereupon, a recess followed.)

5          THE COURT:  Please be seated.

6          Mr. Murphy.

7          MR. MURPHY:  Your Honor, there are just a couple

8     things I want to address from what Attorney Perry said

9     that I think are, in the circumstances, overstatements,

10    quite frankly.

11         The idea that Mr. Brinson was somehow denying

12    that he didn't know there was something wrong here from

13    the get-go.  He did.  He did know there was something

14    wrong here.  And the question goes to Your Honor's

15    question about how did he get involved, how did he let

16    this happen.  As we said earlier, that answer is an

17    incremental answer.  He didn't know as he got involved

18    that it would be what it turned out today.  And what he

19    knew was wrong from the get-go was different from what we

20    now all know what was wrong about this, and that is he

21    didn't know this was a pump-and-dump scheme.  He is not

22    denying that he participated in fraud on the investors.

23    As Your Honor pointed out, the opinion letters were wrong,

24    he knew they were wrong from the beginning.  He shouldn't

25    have signed them.  He didn't understand what they said.

1    And he shouldn't have allowed others to do it.  He made

2    the mistake of trusting them that they were legitimately

3    preparing them for him when in fact we now all know they

4    were doing the exact opposite.

5            So this is not a textbook case of willful

6    blindness.  This is a case where the government has viewed

7    what happened over a period of six years and has not

8    presented to Your Honor anything that sets aside

9    Mr. Brinson's very adamant claim that he didn't know this

10   was a pump-and-dump scheme.  This is a man who I can tell

11   Your Honor from day one, the day the search happened, has

12   been forthright in admitting what he did know that was

13   wrong and drawing the line at that point.  And if there

14   were something that established that he knew that victims

15   were being taken for their money in this process, there

16   would be more to this record than what we've seen.  There

17   would be something to contradict what he says.  But there

18   isn't.  And Your Honor, that's critical.

19           What this really is a textbook case of is it's a

20   textbook case of a sophisticated conman who took advantage

21   of someone who was not only an attorney but

22   unsophisticated in the area of securities.  Mr. Brinson's

23   background matters for this purpose.  He didn't have the

24   training that a lot of us all had.  He didn't grow up in a

25   world where a lot of us grew up where he would have known

1    or would have been caused to suspect.  He wanted to

2    succeed.  He saw success in this process and he made bad

3    decisions because of that.  But he didn't understand the

4    full scope of it throughout.

5            And as to his background, I just want to thank

6    the Court for not putting any weight on the Team Grease

7    video because I believe Your Honor has viewed it for

8    exactly what it is.  And it should play no role in this.

9            THE COURT:  It won't.  It doesn't.

10           MR. MURPHY:  I appreciate that.

11           And so Your Honor asked questions about three

12   different particular things I just wanted to address.

13           The Government's Exhibit Number 15 which

14   suggests perhaps a forgery of investors' signatures.  We

15   don't have any specific understanding either, Your Honor,

16   of what happened there.  What I can tell you is

17   Mr. Brinson assures me that he has never signed any

18   investor's signature to anything.  He would deny any

19   suggestion that that is in fact -- that he did in fact

20   forge any document that went forward there.  Whether

21   others did or not, we have no recollection.

22           THE COURT:  Do you think that his receiving that

23   and being told essentially by Lieberman to scribble other

24   people's names back in 2012 should have raised some red

25   flags with him?

1          MR. MURPHY:  Yes, it should have.  But I can

2     tell you what red flag it did raise, which was one of the

3     problems encountered here is that people didn't get their

4     paperwork on a fast-enough basis, and I believe what he

5     believes happens is that forgery was just to expedite that

6     process.  So that it wasn't meant to be harmful, but to

7     move things along.

8          With respect, Your Honor, to the cash

9     withdrawals from an IOLTA account, I didn't know you could

10    take cash withdrawals from an IOLTA account until I

11    encountered this case, but the cash withdrawals were

12    provided to Mr. Meissenn.  As we've explained to the

13    government, on many of the occasions when the cash

14    withdrawals happened, Mr. Meissenn was at the bank with

15    Mr. Brinson, but Mr. Brinson had to be the one to take the

16    money out.  And that was a way in which Mr. Meissenn took

17    what Mr. Brinson understood was his profit, again,

18    consistent with somebody who didn't want to have bank

19    accounts in his name.  And so he didn't get that cash.

20    That's not cash that came to him.

21          THE COURT:  All right.

22          MR. MURPHY:  Your Honor, the other thing was the

23    $22,000 in the classic car venture.  There was at one

24    point thought of the two of them going into some kind of

25    classic car venture.  Nothing every came of that.

1    Mr. Brinson never received any of that $22,000.  The

2    business didn't happen, at least from Mr. Brinson's

3    perspective.

4              THE COURT:  So that money went out to the

5    venture but then Mr. Brinson didn't see the money again?

6              MR. MURPHY:  That's correct.

7              And then just one other factual point I wanted

8    to clear up.  To the extent anyone left Your Honor with

9    the impression that Mr. Brinson is trying to claim that he

10   did legal work equivalent to the full $200,000, that's not

11   what he's saying.  His estimate is roughly $50,000 of

12   additional legal work was done, but there are no invoices.

13   We have no way of firming that up for the Court.  But

14   there's no question that at least $150,000 came to him for

15   his work in just handling the money and for no other --

16   and doing the opinion letters.

17             THE COURT:  All right.

18             MR. MURPHY:  So finally, Your Honor, the last

19   thing I'd like to say is three years is, with all due

20   respect, too much in this circumstance.  Mr. Brinson is a

21   good person.  There is a great deal on that side of the

22   scale here.  And he has never come to this Court, as many

23   white collar defendants do, asking to get a sentence of

24   probation or some kind of split sentence.  He has come

25   with the full recognition that he needs, because he was an

1   attorney, to spend time incarcerated.  But there are other

2   things that he can do with his life.  I think Your Honor

3   sees his energy.  What we'd ask the Court to do is to make

4   that incarceration as short as possible so that he can get

5   back to his community and start remaking his life and

6   doing everything he can to try to make restitution to the

7   best of his ability.

8              THE COURT:  So do you have anything else to say

9   on the issue of restitution?  I understand from your

10  papers you take the view that it should be a portion.  I

11  think I have the authority, and I don't think the

12  government questions that, to apportion it.  I know you

13  favor an apportionment of about $200,000 as the

14  restitution obligation.  Do you want to speak a little bit

15  more to that?  The government's given me a very detailed

16  chart as to 49 investors and the amounts due.  Do you

17  dispute the accuracy of that or have any thoughts you want

18  to add about what the Court should do in terms of the

19  appropriate restitution?

20             MR. MURPHY:  Well, Your Honor, in terms of the

21  accuracy of it, I have no way of knowing particularly one

22  way or the other what we have by way of records.  The

23  money didn't always come in from individual investors, it

24  came in sometimes in blocks.  I don't have any reason to

25  question the government's numbers either.  The 1.4 odd

1    million dollar number I will assume is an accurate number

2    for the identified investors.

3            THE COURT:  Okay.

4            MR. MURPHY:  Again, Your Honor, with respect to

5    why apportionment should matter here, the ghost in the

6    room, as I've referred to in the past, is the people who

7    haven't been sentenced yet.

8            Another thing I'd ask the Court to consider is

9    Corey comes as one of the least culpably arguably or

10   lesser culpable people in this scheme, but he's here first

11   for sentencing.  And I'd ask the Court to be mindful that

12   he not pay a higher place because he's here first where

13   others, even by the government's estimation, are more

14   culpable are to follow.  And part of that relates to the

15   restitution issue.  Of the people who made the money here,

16   Corey made a lesser amount, a substantially lesser amount

17   than many of them because he did so in a context where he

18   didn't know that investors were being defrauded.  He

19   thought this was a very different kind of scheme.  The

20   fairer, in our view, measure of what he owes back is what

21   he received.  And that's why we ask the Court to apportion

22   that $200,000.  If the Court obviously -- and we don't

23   dispute the Court has the authority to do anywhere between

24   that and the $1.4 million number that's now been

25   identified.  We ask for it in part because the more

1    realistic the number is, I think the greater chance he'll

2    be able to do it without also paying a financial life

3    sentence.

4              THE COURT:  Thank you.

5              MR. MURPHY:  Unless there are any other

6    questions --

7              THE COURT:  I don't think so.

8              Does the government have anything else on the

9    restitution point?

10             MR. PERRY:  Very briefly, Your Honor.

11             You know, I tried to address this in my

12   memorandum.  There are two ways that investors purchased

13   securities in this case.  For the private placement deals

14   that went through IOLTAs of Mr. Brinson or other

15   attorneys, that's a relatively small fraction of the total

16   losses in this case which were through open market

17   trading, investor-to-investor transactions, through a

18   stock trade account, an E-Trade account.  Mr. Brinson

19   didn't know about those transactions.  From the

20   government's perspective, he's not on the hook for them in

21   terms of --

22             THE COURT:  What are you estimating is the total

23   amount at this point if there is an estimate?

24             MR. PERRY:  That is hard to say at this point,

25   Your Honor.  What we've done is we've received the trading

1    records, what are known as blue sheets from the SEC.  We

2    are going through them.  My understanding of the case law

3    in the Second Circuit and elsewhere is that we are

4    required to net out losses and any offsetting gains.

5    There are 28,000 names on that list.  Certainly for

6    restitution purposes, we'd have to net that out.  It's a

7    painstaking process to go through.  We are doing it in

8    part so we can figure out loss, in part so we can

9    ultimately determine restitution, and in part so we can do

10   victim notification for others who are to be charged in

11   the future.  At this point I really don't feel comfortable

12   putting an estimate on the record.  But it will be

13   substantially more than the money that went through

14   Mr. Brinson's IOLTA.

15           THE COURT:  That the other culpable people may

16   be responsible for and liable for under the --

17           MR. PERRY:  That's my expectation.

18           THE COURT:  -- mandatory restitution statute?

19           MR. PERRY:  That would be the government's

20   position.  Substantially more than 1.4.  Even

21   substantially I believe more than the $3 million or

22   $4 million figure.

23           THE COURT:  And the chart you've attached here

24   in terms of the loss amounts and with specific names for

25   some 49 different investors, has that been netted out?

1    Are you sure about that, that those correspond to actual

2    losses?

3              MR. PERRY:  Yes is the answer, it has been

4    netted out.  Essentially what we did is we divided the

5    money going into Attorney Brinson's account into two

6    categories.  There was some that came in directly from

7    identifiable investors and those are the 49 individuals

8    that you see on that chart.  There were others that was

9    sort of pooled into blocks that first came through other

10   accounts.  Typically those were accounts held in the name

11   of shell companies associated with Mr. Meissenn or others.

12   KittiHawk is an example that I've talked about today.

13   $500,000 coming in from KittiHawk.  We know that that

14   money before it came to KittiHawk was the proceeds of

15   security sales to investors.  But to unwind those

16   transactions at this point is not just difficult, I would

17   say it's impossible because of commingling and other

18   accounts that have flowed through.  But perhaps the more

19   salient point is that that money before it came to

20   KittiHawk -- I believe I'm right about this -- was the

21   proceeds of open market sales.  So KittiHawk would sell a

22   block of stock, a million shares on the open market,

23   investors would purchase it on E-Trade or Scottrade or

24   whatever it is.  The money would go to KittiHawk's

25   brokerage account and from there it would go to Attorney

1    Brinson's account.  So that wasn't private placement money

2    in the same way.  It was open market transactions that

3    first went to shell companies and then into

4    Attorney Brinson's account.  So there's no way to identify

5    exactly who those investors were.

6             The $1.4 million figure you've got here is the

7    investors who we can identify individually who sent in

8    money to Attorney Brinson's account.  What we have done is

9    we've netted out, because some of them bought several

10   stocks or were able to sell off some of their stocks at

11   times, and we've netted these people out.  What you're

12   looking at now is what they're actually out of pocket

13   today on these transactions.

14            I should caution -- and I think Your Honor has

15   heard some of this today, some of the individuals who sent

16   in money through Mr. Brinson's IOLTA also lost money in

17   the open market transactions.  So he wouldn't be on the

18   hook for that.  And we haven't netted it out as to those

19   losses.  But we've netted it out against the losses and

20   offsetting gains, in some instances, through his account.

21   So, for instance, if an investor sent in $50,000 to

22   Mr. Brinson's account, sometimes there would also be a

23   $10,000 check back out to that investor.  So we'd have

24   that person down for $40,000 on the restitution chart.

25            THE COURT:  So we have a little bit of

1    uncertainty in part because Mr. Brinson's the first person

2    to be sentenced in this kind of related cases.  To the

3    extent that any additional information should come forward

4    with respect to later charges and sentencings in this case

5    that would warrant a reconsideration of the Court's

6    restitution order, will the government oppose that?

7              MR. PERRY:  No.  I believe that there is a

8    provision to keep the restitution order open for --

9              THE COURT:  Ordinarily for 90 days.  But even a

10   longer period of time in case there were some issues?

11             MR. PERRY:  If Your Honor is amenable to it, I

12   have every expectation that we will have tied down the

13   open market losses within that 90-day period.  Again, I

14   don't know ultimately if any of that will be attributable

15   to Mr. Brinson because it didn't go through his account

16   and there's no evidence he knew about it.  To the extent

17   we are able to unwind those transactions that ultimately

18   flowed into his account, I suppose potentially reopening

19   it --

20             THE COURT:  The government will not oppose?

21             MR. PERRY:  Certainly not.

22             Anything further?

23             THE COURT:  No.

24             Mr. Murphy, anything you want to add?

25             MR. MURPHY:  No, Your Honor.

1          THE COURT:  I'm going to take a five-minute

2     break and return for sentencing.

3               (Whereupon, a recess followed.)

4          THE COURT:  Please be seated.

5          Mr. Brinson, at this time I'm ready to turn to

6     the imposition of sentence.  You may be seated at this

7     time.  I'm going to be talking a little bit about what

8     I've taken into consideration.

9          I'm required, as you well know, under the law

10    I'm required to look at a number of factors that are set

11    forth in the sentencing statute.  I have to, of course,

12    look at your background and characteristics.  I also have

13    to look at what it is you did wrong that brings you into

14    court.

15         I have to think of the various purposes of a

16    criminal sentence that we've heard about today and that

17    you've talked about yourself in terms of what's a just

18    punishment, what is appropriate for deterrence both to

19    yourself and possibly to others, and in terms of

20    rehabilitation in terms of turning things around so you

21    would never be in a position to go back to getting

22    involved in this kind of activity.

23         I also have to think about the Sentencing

24    Guidelines and the advice that they give to me.  I've

25    thought about them.  I'm not going to impose a guideline

1   sentence today, but I have to give them consideration, and

2   I have.

3          I have to think about the need to avoid

4   unwarranted differences in the type of sentence you might

5   receive and the sentence that somebody else in a different

6   courtroom with the same kind of background and same kind

7   of crime would receive for similar conduct.

8          And have I to think, of course, of the need to

9   provide restitution to the victims of your crime.

10         Basically I have to think about everything I

11  know about you, both the "good" and the "not so good" and

12  to decide upon a sentence that's fair, that's just, that's

13  reasonable and, as Attorney Murphy has reminded me, is

14  sufficient but not greater than necessary to achieve those

15  purposes of sentencing.  So I tried to do that in deciding

16  what's an appropriate sentence in your case.

17         I want to talk to you a little bit about the

18  factors that I've thought about.  I will first address

19  customarily what is not so good and then I want to talk

20  about what I think are the good things.

21         My major concern here, I think you've heard this

22  from me already, is I'm very alarmed that you essentially

23  traded on your name and your status and credentials as an

24  attorney to advance a fraud scheme.  It wasn't a scheme of

25  your own making, but I think that you were very important

1    to it, to those parts that you had contact with.

2            The first thing you did, as you've stipulated in

3    your plea agreement, is you signed and on other occasions

4    permitted others to affix your signature to false and

5    misleading attorney opinion letters that were designed to

6    provide assurances to securities, transfer of agents, and

7    prospective investors.  Now, I know you tell me that

8    you're not familiar with securities laws, and I understand

9    that you're not.  I'm convinced any lawyer must and would

10   have known that he or she had no lawful grounds to

11   misrepresent one's self as having undertaken to ensure

12   compliance with the securities laws when in fact you

13   hadn't.  This, in my view, was active fraud.  Nothing to

14   do with negligence.  It was signing these letters and

15   allowing them to go out in the way that you did was to me,

16   in my view, fraud.  And it was really made effective and

17   possible by the fact that you were an attorney.

18           Now, as we've also talked about, you used your

19   attorney trust fund account for the purpose of receiving

20   more than $3 million in transactions that you've, again

21   you stipulated, you used it for more than $3 million or

22   more than $4 million, but as to $3 million, a little bit

23   more than that, you knew and understood involved the

24   proceeds from mail and wire fraud.  Now, I accept that you

25   didn't know the specifics of the pump-and-dump scheme by

1   Meissenn and you didn't know the specifics of exactly how

2   it was that Meissenn and his confederates were duping

3   investors.  But, you know, you have agreed, and I think

4   the evidence is enough to show here, that you knew the

5   money was fraudulently obtained, whatever the particular

6   method of fraud that was involved.

7           I also think that you knew or clearly must have

8   known that it was improper to use an attorney trust fund

9   account as pretty much an ordinary business account rather

10  than as a safety bank account in much the same way you

11  lent your name to the securities counsel letters that were

12  sent out to assure investors or others in the field that

13  you had done your due diligence.  I think you lent your

14  attorney name to validate the decisions by investors to

15  send their money to Meissenn and confederates.  A

16  reasonable investor, in my view, surely would have had

17  more confidence in the integrity of the transactions just

18  from the fact that you were involved and you were

19  designated as the recipient of those monies.  I don't have

20  to speculate on that.  I've heard that today from some of

21  the victims who testified today.

22          How could you have possibly thought that it was

23  okay to take a 5 percent cut from the millions that flowed

24  through your account?  What is it that you were doing for

25  the 5 percent cut?  I know and I'll accept that you

1    performed some legal services, but if you were performing

2    on those other lawful services, then you knew that the way

3    to bill the client was to send the client a bill saying

4    what the services were that were performed, not to take it

5    out of money that had been sent to the trust fund account

6    by clients who had no connection to these services -- not

7    clients, but securities investors who had no connection to

8    these services or much of these services in terms of the

9    zoning and the like that was being performed.  Certainly

10   just the fact of just processing the accounts would not

11   have accounted for that 5 percent cut or I think the

12   evidence is even the attorney securities counsel letters

13   you were being paid $500, charging $500 for each of those.

14   I think that, on balance, you understood the reality that

15   was going on here, that the 5 percent deal was essentially

16   a payoff for your willingness to sign on to false opinion

17   letters and generally to allow the exploitation of your

18   name and your status as an attorney to help Meissenn and

19   his confederates commit fraud.

20          I appreciated your statements today in court and

21   the letter that you wrote to the Court.  I just don't

22   believe part of it.  I don't believe the part in which you

23   claim that you were as naive as you say you were.  In your

24   letter to the Court you said as follows:  "Christian

25   played me for the all too willing naif that I was."  And

1    you also say "and there was no one else in my practice to

2    backstop my poor decision-making."  I think that you

3    understood the value of your name and your status as an

4    attorney and that essentially you dangled those

5    credentials to be exploited by someone like Meissenn who

6    you knew was engaged in fraud of some sort even if you

7    didn't know the full way that he was doing the fraud.  If

8    you had been merely naive, as you claim you were, I think

9    then you would have sought the counsel of any number of

10   outstanding attorneys, some of whom are here in this

11   courtroom today.

12          My doubts about this are reinforced by the

13   additional evidence we talked about, how your response was

14   or lack of response to being asked to scribble in names of

15   other people on documents, as indicated in the e-mail from

16   Lieberman, Exhibit 15 to the government's sentencing

17   memorandum; of the fact that you went into a luxury car

18   venture with your client Meissenn suggests to me there was

19   a closer relationship there, to say nothing of the fact

20   that he also had space adjoining your law office; and of

21   taking out more than $5,000 in cash from the bank account,

22   the attorney trust account, and giving it to somebody who

23   was not in fact a client; and the lack of -- and I didn't

24   hear a convincing answer from you of appropriate

25   additional inquiry that to anybody else would have

screamed fraud.  And I just don't think you were as naive

as you say you were.

You, of course, were subject to the Connecticut

Rules of Professional Conduct.  The very first words of

those rules provide as follows:  "A lawyer, as a member of

the legal profession, is a representative of clients, an

officer of the legal system and a public citizen having

special responsibility for the quality of justice."  And I

think that you dishonored the letter and the spirit of

attorney ethics rules and deeply undermined confidence

that the public would have in the legal profession.  It is

a sad day for the legal profession.

As I look at those factors, I am not convinced

at all that the Sentencing Guidelines overstate the

seriousness of the offense.  I appreciate the arguments

you've made to the contrary.  I've thought about the

departure arguments here, that the guidelines

substantially overstate the seriousness of the offense,

that you lack sophistication, that you've already been

punished enough by the loss of your law license.  I've

considered all those arguments.  I'm not going to depart

downwards or vary downwards on any of those grounds.  The

guidelines, to me, are appropriate here in light of the

quantities, the large amounts of money involved, in light

of the fact that it was real victims and real lives

1    affected, some of whom are here in this courtroom, and

2    real futures for their children and their grandchildren

3    that were affected by your failings.  And in some ways,

4    the guidelines don't really take as much into account, in

5    my view, of the fact that this is not merely an abuse of

6    their trust, it's kind of a super abuse of trust.  So on

7    those grounds, in terms of what it is you did wrong and

8    what you knew, I don't think that the Sentencing

9    Guidelines would be inappropriate here.

10              Now, I'm not going to impose -- I told you I'm

11   not going to impose a Sentencing Guidelines range because

12   I think there are other parts of you, taken as a whole

13   person, as the government certainly acknowledges, that

14   suggest that something less than that should be

15   appropriate, and I agree with that.  I think, although I'm

16   going to impose a severe sentence today, the sentence is

17   for what you did and for not you as a person.  Nobody is

18   the sum of the worst things that they've done in their

19   lives.  And you've done, frankly, quite a bit that's very

20   admirable.  You have not had the advantages of so many

21   other people who rose to your prominence and had the

22   achievements that you did, and you did that a lot because

23   of your hard work, a lot because of your mom's hard work

24   and sacrifice on your behalf.  You have also given back to

25   the community in important ways, whether it was in the

1   public service realm of holding office or seeking public

2   office.  That's to your credit.  And you also have given

3   to the country in terms of your service with the Air Force

4   and subsequent Reserve service.

5          The fact that you have so many people sitting

6   here in the courtroom supporting you also tells me a lot

7   about your intrinsic quality, dispute the flaws that we've

8   talked about, your intrinsic quality.  And I actually -- I

9   told you I don't believe you were as naive, I believe you

10  have good intentions in terms of the future.  And I do

11  think that you have very good teaching gifts, I think

12  you've put it in the sense you wanted to give back.  And

13  whether that's going to be in the area of possibly

14  criminal justice or marketing or real estate, I don't know

15  what that's going to be, maybe you don't know for sure at

16  this point.  But I'm confident that you will do that in

17  the future.  So those reasons, as I put them together,

18  suggest a sentence that's less than what the Sentencing

19  Guidelines would be.

20         Overall, I'm looking at all of the sentencing

21  factors that I've talked about.  My principal concern is

22  what is just punishment for what it is I've described I

23  think you did.  Not as influenced -- I don't think you're

24  going to go back and do more criminal activity.  I do

25  think it's very important to make clear to the general

1    society about the very significant severe costs that occur

2    when somebody of your high position does what you did.

3    And I've also thought about the rehabilitation aspects.

4    In general, I'm persuaded mostly by what the government

5    has said in terms of its recommendations in terms of

6    what's an appropriate sentence in the case.  So I'm going

7    to ask you to stand at this time.

8              Mr. Corey Brinson, for the reasons that I've

9    stated, I hereby sentence you to a term of imprisonment of

10   three years, 36 months of imprisonment.  That will be

11   followed by a term of supervised release with some

12   specific conditions that I'll describe in a moment.  I

13   will not impose a criminal fine.  I will impose an order

14   of restitution that may be subject to amendment, as

15   discussed with counsel, but at this time I believe, in

16   light of my authority to apportion part, I'm going to

17   enter restitution as to the amount recommended by the

18   government of $1,417,810 that corresponds to the monies

19   that came into your trust account that were in your trust,

20   many of them monies sent by victims that are listed, and I

21   think it's an appropriate amount.  Even though it's at a

22   discount of the full -- more than $3 million that came

23   through the account, I do think that's the appropriate

24   amount to hold you responsible for at this time.  And I

25   will also impose a $100 special assessment.

1          The terms of supervised release will include the

2   following:

3          In addition to the standard conditions of

4   supervised release under Section 5D1.3C of the guidelines,

5   the following mandatory conditions that you will not

6   commit another federal, state, or local offense; that you

7   will not unlawfully possess a controlled substance; that

8   you'll make the restitution as ordered by the Court; and

9   of course pay the special assessment; that you will

10  refrain from any unlawful use of a controlled substance

11  and submit to a drug test within 15 days of release on

12  supervised release and at least two periodic drug tests

13  thereafter for use of a controlled substance; that you

14  will cooperate in the collection of a DNA sample as

15  required by the law.

16          And I will also impose a following special

17  conditions:

18          That you must participate in a program

19  recommended by the Probation Office and approved by the

20  Court for inpatient or outpatient substance abuse

21  treatment and testing, and you would be liable to pay all

22  or a portion of the cost of that program in the event that

23  you had the money, although the priority would be paying

24  restitution and not paying for such a program.

25          I'm also going to require that you participate

1    in a program as recommended by the Probation Office and

2    approved by the Court for mental health treatment in light

3    of the challenges that you've had and have been

4    acknowledged.  And to the extent, for some reason, if you

5    had the financial ability apart from your restitution

6    obligations, you would be liable to pay all or a portion

7    of those costs.

8             I'm going to require that you pay the

9    restitution imposed by this judgment that's joint and

10   several with the other defendants involved in this scheme.

11   And that restitution amount, however, is due and payable

12   immediately.  I count on you to effectuate promptly the

13   restitution payments already that have been promised by

14   Attorney Murphy today in terms of the amounts, I gather,

15   for that purpose.  And to the extent that you have any

16   restitution still due and payable after the service of

17   your sentence, that will be payable at a rate of not less

18   than $1,000 per month or 30 percent of your gross monthly

19   income, whichever is greater.  And that amount may be

20   adjusted based upon your ability to pay, and all you need

21   to do is contact your probation officer to seek that.

22            You may also not incur any new credit card

23   charges above $500 or open new additional lines of credit

24   without approval of the probation officer, and you must

25   not add any new names to any lines of credit.  You may not

1    be added as a secondary holder on another person's line of

2    credit.  If you want to seek an exception to that rule,

3    you would need to speak to your probation officer about

4    that.

5          And the last condition is you must provide the

6    probation officer access to any requested financial

7    information and authorize the release of any financial

8    information, and the Probation Office will be authorized

9    to share that financial information with the U.S.

10   Attorney's Office.

11         Those are the conditions of supervised release.

12         You may be seated.

13         THE DEFENDANT:  Excuse me, Your Honor.  What is

14   the length of supervised release?

15         THE COURT:  It's for three years, sir.  That is

16   also subject to a possible motion in the event that you

17   are complying with flying colors, which you might well,

18   with supervised release, you would be able to make a

19   motion to reduce that to the Court.

20         Mr. Murphy, are there any requests concerning

21   voluntary surrender or a designation?

22         MR. MURPHY:  Yes, Your Honor.

23         With respect to designation, Your Honor, would

24   the Court consider recommending Mr. Brinson for

25   designation to an RDAP program given his alcohol issues?

1  If so, it affects where we request a designation.

2    THE COURT:  Does the RDAP program handle alcohol

3 issues?

4    MR. MURPHY:  Yes, Your Honor.

5    MR. PERRY:  I think it does.

6    THE COURT:  I'll make that recommendation.

7    MR. MURPHY:  Thank you.

8    So then we would request designation,

9 Your Honor, either to McKean in Pennsylvania or Lewisburg

10 in Pennsylvania, in that order.

11    THE COURT:  We'll make that clear in the

12 judgment, that request.

13    MR. MURPHY:  Thank you.

14    And we do make an application for voluntary

15 surrender.  Mr. Brinson, as you know, has been aware of

16 this investigation since July of last year.  He's been on

17 $100,000 nonsurety bond with complete compliance, regular

18 contact with me.  I ask the Court to continue that and

19 allow him 60 days to voluntarily surrender.

20    THE COURT:  Government?

21    MR. PERRY:  No objection.

22    THE COURT:  That's granted as well.

23    Tuesday, June 13, does that make sense?

24    MR. MURPHY:  Yes, Your Honor.

25    THE COURT:  All right.  So we'll set Tuesday,

1   June 13, surrender date.

2          The judgment, my law clerk will pass that by the

3   parties to make sure it has the language you're suggesting

4   concerning recommendation.

5          MR. MURPHY:  Thank you.

6          One other request, Your Honor, with respect to

7   restitution.  Would the Court consider waiving running of

8   interest on restitution?

9          THE COURT:  I'm sorry?

10         MR. MURPHY:  I apologize, I have a respiratory

11  infection.  Waiving the running of interest.

12         THE COURT:  Okay.

13         MR. PERRY:  I'm sure the victims would like the

14  interest, but I leave it to the Court.

15         THE COURT:  I'm going to waive the running of

16  interest.  I think it's a very hefty restitution

17  obligation here and the focus should be on repaying the

18  amounts actually due.

19         MR. MURPHY:  Thank you, Your Honor.

20         THE COURT:  Okay.  I'm going to ask all counsel,

21  is there any reason, whether you agree with the sentence

22  or not, why the Court cannot lawfully impose the sentence

23  I've imposed?

24         MR. PERRY:  No reason that I know of.

25         MR. MURPHY:  No.

1          THE COURT:  And is there any request or argument

2    that you believe the Court may have overlooked that you

3    would wish to seek clarification about?

4          MR. PERRY:  Not from the government.

5          MR. MURPHY:  No, Your Honor.

6          THE COURT:  Okay.  So the judgment of the Court

7    will be prepared for my approval by the Clerk's Office in

8    consultation with the Probation Office.

9          Mr. Brinson, you do have rights to appeal the

10   judgment and the sentence to the extent that that's not

11   limited by a waiver of appeal rights that's in your plea

12   agreement.  The important thing for you to know is that

13   you would need to file any notice of appeal within 14 days

14   and that if you could not afford counsel to represent you

15   for purposes of an appeal, counsel would be appointed to

16   represent you.  Do you understand that, sir?

17         THE DEFENDANT:  I do, Your Honor.

18         THE COURT:  Is there anything else to take up at

19   this time?

20         MR. PERRY:  No, Your Honor.  Thank you.

21         MR. MURPHY:  No, Your Honor.

22         THE COURT:  Thank you all.  We'll stand in

23   recess.

24              (Proceedings adjourned at 1:42 p.m.)

25

1

2                          C E R T I F I C A T E

3

4        RE: UNITED STATES OF AMERICA v. COREY BRINSON

5                         No. 3:17CR9(JAM)

6

7            I, Diana Huntington, RDR, CRR, Official Court

8    Reporter for the United States District Court for the

9    District of Connecticut, do hereby certify that the

10   foregoing pages 1 through 122 are a true and accurate

11   transcription of my shorthand notes taken in the

12   aforementioned matter to the best of my skill and ability.

13

14

15

16

17                    _____
                              /s/

18                    DIANA HUNTINGTON, RDR, CRR
                         Official Court Reporter
19                    United States District Court
                       141 Church Street, Room 147
20                    New Haven, Connecticut 06510
                            (860) 463-3180
21

22

23

24

25