UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| | : | No. 3:17-cr-000009 (JAM) |
| v. | : | |
| | : | |
| COREY J. BRINSON, | : | |
| | : | |
| Defendant. | : | |
| | : | July 17, 2020 |

**MEMORANDUM IN SUPPORT OF MOTION FOR EARLY TERMINATION OF
SUPERVISED RELEASE**

**I.**     **Introduction**

Corey Brinson's conduct from the time of the search of his law office, to the voluntary

suspension of his law license, through his plea and acknowledgement of guilt, during his

incarceration, and now, across almost 15 months of supervised release, reveals a man who

deeply regrets his wrongdoing, and who is acting responsibly to redress it.  As more fully

described below, Mr. Brinson has taken many steps to rebuild his life and reputation.  His goal is

not only to ensure that he is not ultimately defined by his crime, but also to help his community

and the victims of his offense.

The most prominent duty that remains in pursuing that goal is Mr. Brinson's significant

restitution obligation.  That debt is in fact a large part of why he is filing this motion.  The Court

ordered him to pay $1,410,610 in restitution, jointly and severally with several related-case

defendants.  This motion seeks to be a very preliminary step in Corey Brinson's effort to apply

for re-admission to the bar.  Although he is currently working two jobs, and is paying what he

can in restitution, Mr. Brinson recognizes that his best chance to improve his own circumstances,

and to make more substantial restitution payments to his victims, rests with returning to the

practice of law.

Now, supported by family, friends, and advisers who have stuck with him through his down times, Corey Brinson is confident that he can return to the practice of law – albeit this time with the benefit of the critical lessons learned from his past misconduct.[1]  The opportunity to do so would not only allow Mr. Brinson to begin to repair his reputation and pursue the career he loved, but also would permit him to pay far more restitution than he ever will be able to pay in his current situation.  For that reason, as well as for all the additional reasons more fully described below, we submit that early termination of supervised release is fully supported on this record.

## II.    **Factual Background**

On July 12, 2016, almost exactly four years ago, federal agents executed a search warrant at Corey Brinson's law office.  What followed was a dramatic and sudden comeuppance for a young man who, with the help of a loving, hard-working mother, had overcome a challenging start in life to attend college, to serve his country in the military, and to graduate from law school.  From there, Corey pursued a career in private practice, first as an associate at the state's largest law firm, and later as a successful solo practitioner.  But, on November 10, 2016, at age 36, Corey Brinson found himself before Judge Antonio Robaina in Superior Court to voluntarily suspend his hard-won license to practice law.  Two months later on January 20, 2017, he stood before this Court to plead guilty to violating 18 U.S.C. § 1957.  On April 13, 2017, this Court sentenced Mr. Brinson to 36 months imprisonment, three years of supervised release, and $1,410,610 in restitution.  See Doc. # 37.

---

[1] To avoid any thought that Mr. Brinson is spending funds on counsel to present this motion, undersigned counsel represents that he is assisting Mr. Brinson on a pro bono basis, and has done so since the conclusion of Mr. Brinson's sentencing in April 2017.

In the space of nine months, Corey Brinson went from being a successful practicing attorney to a convicted felon with no right to pursue his profession.  Things happened that quickly precisely because Mr. Brinson readily owned up to his wrongdoing and accepted his punishment.  From the shocking moment when law enforcement officers showed up at his door, Corey began to accept responsibility.  He escorted the agents from his home to his office to facilitate their execution of the search warrant there.  He promptly directed undersigned counsel to negotiate an appropriate guilty plea, and also promptly retained disciplinary counsel to begin the process of voluntarily suspending his law license.  When he learned that Christian Meissenn was trying to negotiate a check that would have removed the balance of the funds - $15,913.38 - remaining in his IOLTA account, Mr. Brinson immediately moved to stop payment to preserve those funds for restitution.

Continuing his acceptance of the consequences of his misdeeds, Mr. Brinson served his term of imprisonment as a model prisoner at FCI-Lewisburg.  He received no disciplinary tickets while in custody, and he successfully addressed his issues with excessive use of alcohol in the Bureau of Prison's RDAP program.  Following his release from custody, including periods in a half-way house and home confinement, Corey began supervised release on April 22, 2019.  According to Supervisory U.S. Probation Officer Jonathan Sitek, Corey was thereafter transferred to the Probation Office's "low-intensity administrative caseload since 7/12/19 without incident."  See Tab A, at 2.

Since his release, Mr. Brinson has successfully begun his reintegration into the community, making excellent use of his time both to serve others and to begin to re-build his own life.  He has voluntarily sought out opportunities to speak to a variety of audiences about his crime and subsequent punishment, including at a juvenile prison, to a class at UCONN law

3

school, and to several community organizations.[2]  See, e.g., Tab B.  He also has volunteered his

time at the YMCA Teen Tech Center, which is a partnership between Best Buy and the YMCA

to prepare teens from underserved communities to take on tech-focused jobs of the future.  See

Tab C.

On the work front, Corey started a criminal justice consulting business named Second

Chance Firm, LLC soon after his release.  Structured with advice from his former professor,

Mark Dubois, Esq., to ensure compliance with his professional restrictions, Corey's new

business was designed to assist people seeking state pardons – for which an adviser need not be

an attorney -- and to consult with individuals facing incarceration on how to be successful in

federal prison.  In that role, Corey also offered the opportunity to several young people to gain

valuable job experience as interns.  In addition, in January of this year, Corey began a full-time

job at a not-for-profit law firm in New York City, the Legal Action Center.  There, he works, not

as an attorney, but as a Policy Associate lobbying governmental officials for various criminal

justice reforms.

Despite his busy work schedule, Corey Brinson has also made time in the past year to run

for the Hartford City Council.  While he did not win, his platform spoke clearly and very

publicly – including in a televised interview to the Hartford region and an op-ed in the Hartford

Courant -- about his mistakes and the societal benefits to be gained by affording a second chance

to convicted felons like himself.  See Tab D.  Over 500 Hartford residents cast their votes for

---

[2] Professor Levin of UConn Law shared with Mr. Brinson a comment she had received from one of the students who heard him speak to her class.  With permission of Professor Levin, that student's comment is quoted here with the name redacted, as it speaks to the energy Corey brings to these speaking opportunities.  In key part, that student offered that "last week's talk with Corey was incredible!  Several of my friends and I found him to be one of the best class experiences in law school."

him, proving that he has a base of community support beyond just his family and friends.[3]  In addition, this past year Mr. Brinson returned to law school at UConn to pursue an LLM in Human Rights and Social Justice.  In this most recent semester, Corey won the CALI award in Prof. Birmingham's class on the Nuremberg Trials.  He is currently on pace to graduate from that LLM program in May 2021.[4]

While these various activities have proved beneficial to both Mr. Brinson and many members of his community, they are not highly remunerative.  In fact, his Second Chance Firm, LLC has struggled to break even, and his non-profit lobbying work in New York, while a valuable cause and experience, pays only a modest wage that is offset by, among other expenses, significant travel costs.  Still, Mr. Brinson is committed to making timely restitution payments of 30% of his gross monthly income or $1,000, whichever amount is greater.  To date, Corey has paid almost $60,000 in restitution, see Tab E, but of course he remains subject to pay dramatically more.  Having just passed his 40th birthday, Corey Brinson's best chance to make meaningful restitution payments in the future would come from having the opportunity to return to the practice of law sooner rather than later.  In his final years as an attorney, Mr. Brinson earned about four times what he currently makes.

For the reasons argued below, Corey Brinson respectfully requests that the Court conclude his supervised release to allow him to advance that career goal.  Doing so will by no means grant him permission to be re-admitted to the practice of law.  The re-admission process is a multi-step series of proceedings to be addressed by several State of Connecticut authorities down the road no matter this Court's ruling on this motion.  See Conn. Prac. Book § 2-53.

---

[3] Mr. Brinson ran a shoestring campaign in which he solicited no campaign contributions, and spent less than $1,000 of his own money.

[4] Mr. Brinson qualified to attend this program through a tuition waiver available to veterans who, like him, served on active duty during the events of September 11, 2001.

Whenever Mr. Brinson is permitted to re-apply for admission to the bar, it will be up to those authorities, to determine whether and under what conditions he may do so.

III.   **Applicable Law**

"Supervised release fulfills rehabilitative ends, distinct from those served by incarceration." United States v. Johnson, 529 U.S. 53, 59 (2000).  Congress intended supervised release to "giv[e] district courts the freedom to provide postrelease supervision for those, and only those, who needed it." Id. at 709.  Defendants "may, of course, vary in the degree of help needed for successful reintegration." Id.  Thus, pursuant to 18 U.S.C. § 3583(e)(1), a "court may, after considering the factors set forth in section 3553(a)(1), (a)(2)(B), (a)(2)(C), (a)(2)(D), (a)(4), (a)(5), (a)(6), and (a)(7) . . . terminate a term of supervised release and discharge the defendant released at any time after the expiration of one year of supervised release . . . if it is satisfied that such action is warranted by the conduct of the defendant released and the interest of justice . . . ." [5]

Not surprisingly, the relevant considerations for deciding a motion for early termination of supervised release are the same well known section 3553(a) factors that guide the Court in imposing sentence.  See United States v. Weintraub, 371 F.Supp.2d 164, 166 (D. Conn. 2005).  "Subsection 3583(e)(2), in sum, requires the court to consider general punishment issues such as deterrence, public safety, rehabilitation, proportionality, and consistency, when it decides to

---

[5] "The . . . consideration of the Sentencing Commission's guidelines and policy statements, under § 3553(a)(4) and (5), is constrained by the fact that the Commission has not promulgated any guidelines or policy statements addressing early termination of supervised release, but limited its policy guidance to violations of supervised release. . . .  In addition, given the 'vary[ing] . . . degree of help' different defendants may need for reintegration into the community . . . the . . . factor of avoiding unwarranted sentencing disparities, under § 3553(a)(6), would generally undermine the case specific inquiry required in evaluating a motion for early termination of supervised release, such that this factor has limited utility in this context." United States v. Harris, 258 F. Supp. 3d 137, 145 (D.D.C. 2017) (citations omitted); see also United States v. Lovo, No. CR 13-262-01 (RMC), 2020 WL 32561, at *2 (D.D.C. Jan. 2, 2020).

'modify, reduce, or enlarge' the term or conditions of supervised release." <u>United States v.</u>
<u>Lussier,</u> 104 F.3d 32, 35 (2d Cir. 1997).

"The decision whether to grant early termination of supervised release under § 3583(e)
rests within the discretion of the district court." <u>United States v. Rasco</u>, No. 88 CR 817(CSH),
2000 WL 45438, at *1 (S.D.N.Y. Jan. 19, 2000). "Occasionally, changed circumstances -- for
instance, exceptionally good behavior by the defendant or a downward turn in the defendant's
ability to pay a fine or restitution imposed as conditions of release will render a previously
imposed term or condition of release either too harsh or inappropriately tailored to serve the
general punishment goals of section 3553(a)." <u>Lussier,</u> 104 F.3d at 36. "However . . . the plain
language of <u>Lussier</u>, . . . does not *require* new or changed circumstances relating to the defendant
in order to modify conditions of release, but simply recognizes that changed circumstances may
in some instances justify a modification. . . . So long as the court, when modifying supervised
release conditions, considers the relevant 18 U.S.C. § 3553(a) sentencing factors, there is no
additional requirement that it make a finding of new or changed circumstances with respect to
the defendant." <u>United States v. Parisi</u>, 821 F.3d 343, 347 (2d Cir. 2016) (citation omitted;
emphasis in original).

In making this application, Corey Brinson fully recognizes that full compliance is
expected of all defendants. People are supposed to behave in prison. Inmates enrolled in RDAP
are expected to complete the program and apply its processes upon release. People are supposed
to comply with the terms of their supervised release post-incarceration. But, Corey has done far
more than the bare minimum needed to comply. He has affirmatively sought out opportunities to
use his experiences to better himself and his community. Like the defendant in <u>United States v.</u>
<u>Harris</u>, 689 F. Supp. 2d 692, 695 (S.D.N.Y. 2010), Corey Brinson has, in addition to all the good

work he has done since beginning his sentence, "demonstrate[d] convincingly that being on supervised release . . .  creates multi-faceted obstacles to his advancing in his [career]. . . ."  As explained below, as a practical matter, Corey cannot even begin to seek re-admission to the bar until he has been off supervised release for at least one year.  See Statewide Grievance Committee v. Ganim, 311 Conn. 430, 467 n.35 (2014).

We respectfully submit that the behavior exhibited by Corey Brinson in handling his punishment and working to rehabilitate himself over the three-plus years since he was sentenced, combined with the fact that continued supervised release will create its own impediment to his ability to re-apply for admission, merit this Court reducing his term of supervised release to conclude continued supervision at this time.

The Probation Office has advised undersigned counsel that it does not oppose this request.  See Tab A, at 1.  Upon being asked for its position, the government sought input from Mr. Brinson's victims.  After making that inquiry, government counsel, AUSA Peter Jongbloed, has advised undersigned counsel that the government has no objection to concluding Corey Brinson's supervised release after two years, or as of April 22, 2021.  We respectfully submit that if early termination is appropriate at all, it is appropriate now, for all the reasons more fully reviewed below.

## IV.   Argument

### A.  The Section 3583(e)(1) Factors Support Early Termination

The aspects of section 3583(e)(1) applicable in this case support the early termination of supervised release.

1. **The Nature and Circumstances of Corey Brinson's Offense and His History and Characteristics**

Consideration of the nature and circumstances of the offense and Corey Brinson's history and characteristics weighs in favor of the termination of his supervised release. Prior to the events leading to his conviction, Mr. Brinson led an upstanding life that included honorable military service, abundant volunteer work, and frequent pro bono representation of indigent clients. See Doc. # 18, at 2-6. Corey showed a dedication to hard work and education as he escaped a neighborhood rife with drugs and gang violence to achieve a career as an attorney. He demonstrated in the past what he has been demonstrating since his release: He welcomes hard work and a challenge. His history and characteristics are those of someone who merits a second chance.

While he was by no means the mastermind of the offense in which he participated, Corey Brinson's involvement was unquestionably wrong and he has admitted as much. The government acknowledged at the time of sentencing that Corey played a more limited role than some of the other wrongdoers. See Doc. # 23, at 3. But, rather than re-litigate who did what and who knew what, Mr. Brinson would prefer to continue to demonstrate his remorse by doing the one thing he can still do to redress his non-violent misconduct: pay restitution.

A review of these unique circumstances demonstrates that Corey Brinson made a serious, but aberrational misstep when he became involved with Christian Meissenn. That person was not who he had been raised to be, and it is not who he is today. His exemplary conduct since his wrongdoing came to light, as well as his ongoing efforts to better himself and to provide service to others, together support early termination of his supervised release. See e.g., United States v. Clark, No. 94 CR. 643-02(CSH), 2004 WL 2978281, at *3 (S.D.N.Y. Dec. 20, 2004).

2.  **The Need for the Sentence Imposed to Afford Adequate Deterrence to Criminal
    Conduct; to Protect the Public from Further Crimes of the Defendant; and to
    Provide the Defendant with Needed Educational or Vocational Training,
    Medical Care, or Other Correctional Treatment in the Most Effective Manner**

Additional supervised release is not needed to deter Corey Brinson from criminal conduct

or to protect the public.  The irony of Corey Brinson having committed this crime is that he had

navigated through his early life to avoid the easy alternative of street-level drug dealing that was

pervasive in his neighborhood.  As a young man, Mr. Brinson declined to take the easy way out.  He

made that choice because that is who he really is, and now, having learned his lesson from going

astray, that is who he is committed to remain.  He has demonstrated in more than a year of supervised

release that he is no risk to re-offend, and he has, as a result, been placed on Probation's low-

intensity administrative caseload since soon after his release.  As noted, Probation does not oppose

this request for early termination.  See Tab A, at 1.  Rather than an ongoing risk, Corey has dedicated

himself to helping others throughout his life and wants nothing more than a chance to do that again

by starting over and making the story end the right way this time.  Most recently, Mr. Brinson has

been consumed by the need to assist his mother who has suffered a series of strokes.  For reasons of

cost, Corey's mother has been sent home from the long-term-care facility where she had been

rehabilitating, and Corey has become one of her principal caregivers.  In sum. Mr. Brinson's

behavior across the past four years has established that there is no need for further deterrence from

future criminal conduct.

"[E]xceptionally good behavior by the defendant" can "render a previously imposed term

or condition of release either too harsh or inappropriately tailored to serve the general

punishment goals of section 3553(a)." Lussier, 104 F.3d at 36.  Corey has completed almost 15

months of his three year term of supervised release in exemplary fashion.  He successfully

completed the Federal Bureau of Prisons' RDAP program, and also completed an outpatient

program at CRT—Behavioral Health Services as part of his supervised release.  See Tab F.  He has made restitution payments consistently – more than any of his related defendants -- and was transferred to the low-intensity administrative supervision caseload on July 12, 2019.  See Tab A, at 2.  Corey's post-conviction conduct, however, goes well beyond simply complying with the conditions and expectations of his supervised release.  Contra Rasco, 2000 WL 45438, at *2 ("model prison conduct and full compliance with the terms of supervised release is what is expected . . . .").  In addition to publicly accepting responsibility for his actions and being fully compliant with the terms of his supervised release, Corey volunteers at the YMCA and Hartford Public Schools.  See Tab C.  Corey takes a three hour train ride to New York City to work as a policy advocate for the Legal Action Center, a non-profit law firm.  "The Legal Action Center . . . uses legal and policy strategies to fight discrimination, build health equity, and restore opportunity for people with criminal records, substance use disorders, and HIV or AIDS."  See Legal Action Center, https://lac.org/ (last visited July 16, 2020).  As noted, he created the Second Chance Firm, LLC, a criminal justice consulting firm that he established to use his experiences to help others "maximize the opportunity of federal prison, and rebuild their lives following incarceration."  Second Chance Firm, https://www.secondchancefirm.com/ (last visited July 16, 2020).[6]  In addition to his two jobs, Corey is committed to bettering himself and furthering his education, and is working toward an LLM in Human Rights and Social Justice at the University of Connecticut by attending weekly law school classes.  In short, he has conducted himself as a model supervised releasee.

---

[6] Most recently, Mr. Brinson has co-authored an article in the Connecticut Law Tribune with his former professor and mentor, Mark DuBois, Esq., addressing the need for Black lawyers and other legal professionals in these turbulent times.  See Black Lawyers Matter: Dismantling Inequality, CT Law Tribune (July 13, 2020).

Further supervised release is not needed to provide Corey Brinson with educational, vocational, or correctional treatment. If anything, supervised release interferes with Corey's vocational opportunities inasmuch as he cannot make use of his educational and vocational training until he is able to re-apply for admission to the bar.

### 3. The Need to Provide Restitution to Any Victims of the Offense

There are no doubt cases in which it is completely reasonable for the Court to continue supervision of a defendant precisely because that supervision is needed to maximize whatever restitution may ever be paid. This is not such a case. Here, concluding supervision would pose no risk to the victims of receiving diminished restitution. That is because, not only has Mr. Brinson demonstrated his good-faith commitment to making restitution to date -- having paid more than any of his related defendants -- but he also has every incentive to continue to abide the Court's order with respect to restitution if he ever hopes to be re-admitted to the bar.

Early termination of supervised release is important to Corey Brinson's prospect of making continued, and in fact increased, restitution payments because of the process by which he will be considered for reinstatement to the bar. By the terms of the May 18, 2017 Order imposing the conditions governing Mr. Brinson's ability to apply for reinstatement of his suspended license, the earliest he may do so is May 10, 2021, but, that date applies only if he is terminated early from his supervised release. See Tab G. Even if this Court grants Mr. Brinson's motion for early termination, the practical import of the Ganim case is an informal requirement followed by bar officials that requires the applicant to have been off supervised release for at least one year before being considered for reinstatement. That policy means that any such application for reinstatement by Corey Brinson would be considered, at the earliest, one

year after the termination of his supervised release.[7] See, e.g., Tab H (Report of Standing Committee on Application of John Wang for Reinstatement, at p.5, ¶C; p.6, ¶E).  As a consequence, even if this Court were to terminate Mr. Brinson's supervised release on the same date of this filing, his application for reinstatement would not be taken up until mid-July 2021 at the earliest.  By the same token, if Mr. Brinson were to be required to complete the remaining period of supervised release contemplated by his sentence, he then could not apply for license reinstatement until November 10, 2022.  See Tab G.  Then, as described above, the policy followed by the relevant disciplinary authorities would mean that his application for reinstatement would not be considered until a year later, in November of 2023, or about 40 months from now, at the earliest.  In other words, if Mr. Brinson remains on supervised release for its full term, he is more than three years away from even being considered for reinstatement, whereas, if he is terminated on supervised release now, he may begin the process of seeking reinstatement in about one year's time.

No one recognizes better than Corey Brinson that, no matter when he is entitled to apply for reinstatement, there is no guarantee that it will be granted.  That decision will follow a lengthy process of review, and will ultimately rest in the first instance in the hands of a standing bar committee that will hold a hearing related to Corey's reinstatement application on notice to the public and with participation by the Statewide Grievance Committee and Office of the Chief Disciplinary Counsel.  See Conn. Prac. Book § 2-53(h).  That standing committee then will issue

---

[7] We understand that the source of this informal requirement comes from the decision in Ganim, 311 Conn. at 467 n.35.  There, the Connecticut Supreme Court wrote: "Although we agree with the defendant that a person's good behavior while he or she is incarcerated or on supervised release is not entirely incompetent evidence of his or her rehabilitation, we also concur with the trial court that a person's ability to maintain the straight and narrow outside the confines of a structured and supervised life lends much stronger support to a finding of moral fitness. We reiterate that the defendant applied for reinstatement less than one year after serving his prison term, while he remained on supervised release."

its post-hearing recommendation in a report to the Superior Court.  See id. § 2-53(k).  From there, a three-judge panel of the Superior Court will conduct a hearing to determine whether to accept the recommendation of the standing committee.  See id. § 2-53(l).  At that subsequent hearing, in addition to Mr. Brinson as the applicant for reinstatement, the Statewide Grievance Committee, the Office of the Chief Disciplinary Counsel, the standing committee, and the public will all have an opportunity to be heard.  See id.  At all times throughout this reinstatement process, Corey Brinson would bear the burden of establishing "by clear and convincing evidence that he . . . possesses good moral character and fitness to practice law. . . ."  Id. § 2-53(j).

Significant for the present motion to this Court, the readmission requirements include an express obligation to comply with any restitution commitments.  See id. § 2-53(d)(4).  Beyond that Practice Book requirement, Mr. Brinson's suspension agreement with the Chief Disciplinary Counsel, which agreement was thereafter adopted as a court Order, also includes an express obligation that Mr. Brinson be in compliance with this Court's restitution payment plan to even be considered for reinstatement.  See Tab G.  As a consequence, Mr. Brinson knows that his continued payment of restitution is a requirement for any future successful bid to be re-admitted to the bar, and that his performance of that restitution obligation, as but one part of his claim to be of good moral character and fitness to practice law, will be reviewed by a host of authorities, including a standing committee of the bar, the Statewide Grievance Committee, the Chief Disciplinary Counsel, and, ultimately, a three-judge panel of the Superior Court.  Beyond those authorities, the Financial Litigation Unit of the U.S. Attorney's Office will monitor his compliance going forward.

We respectfully submit that any remaining benefit to be obtained from the continued supervision of Corey Brinson is outweighed by the reasonably anticipated increase in restitution

payments likely to follow upon his return to the practice of law sooner rather than later.  Corey

remains well supported in his community and, thus, has a realistic prospect of rebuilding a

successful career as a lawyer.  If he does so, he will enhance his income in a way that benefits

the victims of his crime and himself.  Given that he can be reinstated only if he complies with

this Court's restitution Order, Corey has every incentive – consistent with the incentive he would

have if he were to remain under supervision – to continue to comply.  In other words, given

Corey's exemplary behavior from investigation through to the present, the main condition

justifying continued supervision is his obligation to pay restitution, which he has no less an

incentive to continue to abide even if supervision is terminated early.  As such, we respectfully

submit that an assessment of Corey Brinson's exemplary conduct over the past four years,

combined with shortening the time until he may seek to advance his career, warrants the early

termination of his supervised release.

**B.  Corey Brinson's Supervised Release Impedes Advancement of His Employment**

Early termination of supervised release is warranted when a defendant demonstrates that

supervised release creates obstacles to the defendant's advancement in his employment.  See

e.g., Harris, 689 F.Supp.2d at 695.  For example, in United States v. Buckler, No. 08 CR

800(SJ), 2011 WL 3439526, at *2 (E.D. N.Y. June 15, 2011), the defendant was a street

performer and his "supervised release conditions hinder[ed] [his] ability to accept invitations to

perform in various venues."  Therefore, the court terminated the defendant's supervised release

so that the defendant could "maximize his earning potential as a street performer."  Id.  Likewise

here, the constraints on Mr. Brinson's opportunity to apply for re-admission to the bar limit his

earning potential, which in turn restrict what he can pay in restitution.  Because Corey Brinson's

opportunity to seek re-admission to the bar will be substantially delayed if his period of

15

supervised release is not terminated early, "remaining on supervised release will threaten his opportunities to advance or endanger any employment he may have." United States v. Bastien, 111 F.Supp.3d 315, 222 (E.D. N.Y 2015).

This is not an instance where there is a "mere possibility of a future hardship" or speculation that disclosure of supervised release would deter potential employers. Contra Rasco, 2000 WL 45438, at *2. Rather, by delaying the time when Mr. Brinson can seek re-admission to the bar, his current three-year term of supervised release is actively "prevent[ing] him from [pursuing] more lucrative employment." Id. While it is not this Court's responsibility to decide whether Corey will ever be reinstated, this Court's decision on this motion will control the timing of when that decision can be addressed by those authorities who are charged with that responsibility. Given that his victims stand to benefit by Corey's return to practice sooner rather than later, we submit that it is in everyone's interest to allow that process to begin to move forward a year from now rather than more than three years from now.[8]

---

[8] While the terms upon which Corey Brinson may ever be re-admitted to the bar will be decided by other authorities in the future, he nonetheless wishes to assure this Court that, should that opportunity come, he is prepared to accept any appropriate conditions on his re-admission. For example, Mr. Brinson is prepared to welcome a requirement that he have a court-approved member of the bar assigned to supervise and mentor him in returning to the practice of law. Likewise, he understands that he is likely to have enhanced CLE obligations, and he would welcome a pro bono requirement. He is also fully prepared to continue to make himself available to speak to bar groups, law school students, and members of the community about his story to allow others to benefit from his missteps as well as his efforts to rehabilitate himself.

**V.**     <u>**Conclusion**</u>

For the foregoing reasons, Corey Brinson hereby respectfully moves this Court to

exercise its discretion to terminate his remaining term of supervised release.

Respectfully submitted,

THE DEFENDANT,
COREY J. BRINSON

By: //s// Thomas J. Murphy (ct07959)
      Thomas J. Murphy (ct07959)
      Cowdery & Murphy, LLC
      280 Trumbull Street
      Hartford, CT 06103
      (860) 278-5555 Office
      (860) 249-0012 Facsimile
      tmurphy@cowderymurphy.com

- His Attorneys –

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 17, 2020, a copy of the foregoing was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

<u>//s// Thomas J. Murphy (ct07959)</u>
Thomas J. Murphy